EXECUTION VERSION

**BILL OF SALE AND PURCHASE AGREEMENT**

**among**

**MNergy, LLC**
**(as "Buyer")**

**and**

**Aceco Valve, Inc.**
**(as "Seller")**

**and**

**Patricia A. Wolf**

**April 6, 2018**

Exhibit 1.1

**Table of Contents**

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................ 1

ARTICLE 2 PURCHASE AND SALE OF ASSETS AND PURCHASE PRICE........................ 9
    2.1      Purchase and Sale of Assets................................................................. 9
    2.2      Excluded Assets ................................................................................. 13
    2.3      Assumed Liabilities ........................................................................... 14
    2.4      Excluded Liabilities ........................................................................... 14
    2.5      Purchase Price.................................................................................... 16
    2.6      Prorating and Settlement .................................................................... 16
    2.7      Allocation.......................................................................................... 17
    2.8      Expenses ............................................................................................ 17
    2.9      Real Estate Purchase and Sale Agreement                   18

ARTICLE 3 REPRESENTATIONS AND WARRANTIES REGARDING SELLER, THE
            BUSINESS, AND THE PURCHASED ASSETS AND THE ASSUMED
            LIABILITIES............................................................................................ 18
    3.1      Organization, Qualification and Corporate Power............................. 18
    3.2      Capitalization; No Affiliates .............................................................. 18
    3.3      Authority............................................................................................ 18
    3.4      No Conflicts ....................................................................................... 19
    3.5      Financial Statements. ......................................................................... 19
    3.6      Absence of Certain Changes .............................................................. 20
    3.7      No Undisclosed Liabilities ................................................................. 21
    3.8      Title to and Sufficiency of Assets ...................................................... 21
    3.9      Tangible Personal Property; Condition of Purchased Assets .............. 22
    3.10    Work-in-Progress ............................................................................... 22
    3.11    Inventory ........................................................................................... 22
    3.12    Real Property. .................................................................................... 22
    3.13    Contracts. ........................................................................................... 24
    3.14    Intellectual and Other Intangible Property......................................... 26
    3.15    Tax. ................................................................................................... 27
    3.16    Legal Compliance ............................................................................. 29
    3.17    Litigation .......................................................................................... 29
    3.18    Product and Service Warranties ......................................................... 29
    3.19    Environmental ................................................................................... 30
    3.20    Employees ......................................................................................... 31
    3.21    Employee Benefits. ............................................................................ 32
    3.22    Customers and Suppliers.................................................................... 33
    3.23    Transactions with Affiliates .............................................................. 33
    3.24    Capital Expenditures ......................................................................... 35
    3.25    Insurance ........................................................................................... 35

Exhibit 1.2

3.26    Solvency..................................................................................................... 35
3.27    No Brokers' Fees ........................................................................................ 35
3.28    Disclosure ................................................................................................... 35
3.29    Computer and Technology Security ........................................................... 34
3.30    Data Privacy ............................................................................................... 36
3.31    Non-competition Covenants ....................................................................... 36

ARTICLE 4 REPRESENTATIONS AND WARRANTIES REGARDING BUYER................ 36
4.1    Organization and Authority ........................................................................ 36
4.2    No Conflicts ................................................................................................ 36
4.3    Litigation .................................................................................................... 36
4.4    No Brokers' Fees ........................................................................................ 36
4.5    Tax Liens…………………………………………………………………..36

ARTICLE 5 NON-COMPETITION AND NON-SOLICITATION BY SELLER ................. 37
5.1    Definitions .................................................................................................. 37
5.2    Covenants by Seller and Wolf .................................................................... 38
5.3    Exceptions; Publicly-Traded Securities ..................................................... 38
5.4    Reasonableness of Restrictions .................................................................. 38
5.5    Injunctive Relief; Expenses ....................................................................... 38
5.6    Accounting for Profits ................................................................................ 39
5.7    Blue Penciling ............................................................................................ 39

ARTICLE 6 EMPLOYEES AND EMPLOYEE BENEFITS ............................................... 39
6.1    Salaries and Benefits .................................................................................. 39
6.2    WARN Act Obligations .............................................................................. 40
6.3    Seller's Retirement and Savings Plans. ...................................................... 41
6.4    General Employee Provisions ..................................................................... 41
6.5    No Third Party Beneficiaries ...................................................................... 41

ARTICLE 7 POST-CLOSING COVENANTS ..................................................................... 41
7.1    Payment of Excluded Liabilities ................................................................ 41
7.2    Payment of Assumed Liabilities ................................................................ 41
7.3    Bulk Transfer Compliance .......................................................................... 41
7.4    Tax Covenants. ........................................................................................... 42
7.5    Consents ...................................................................................................... 42
7.6    Mail and Receivables .................................................................................. 43
7.7    Litigation Support ....................................................................................... 43
7.8    Transition .................................................................................................... 44
7.9    Confidentiality ............................................................................................ 44
7.10   Retention of and Access to Books and Records ......................................... 44
7.11   Change of Seller's Name ............................................................................ 44
7.12   Severance Liability of Certain Seller Employees ...................................... 44
7.13   Title Documents .......................................................................................... 45
7.14   Intentionally Omitted .................................................................................. 45
7.15   Tail Insurance Coverage ............................................................................. 45
7.16   The New Lease ............................................................................................ 45

Exhibit 1.3

ARTICLE 8 LOSSES AND INDEMNIFICATION.................................................................. 45
    8.1    Indemnification by the Seller Parties ............................................... 45
    8.2    Indemnification by Buyer ................................................................. 45
    8.3    Survival and Time Limitations ........................................................ 46
    8.4    Limitations on Indemnification by Seller Parties ............................. 46
    8.5    Claims Not Involving Third Parties .................................................. 47
    8.6    Third-Party Claims........................................................................... 47
    8.7    Manner of Payment.......................................................................... 48
    8.8    Other Indemnification Matters ........................................................ 49

ARTICLE 9 MISCELLANEOUS ....................................................................................... 49
    9.1    Further Assurances........................................................................... 49
    9.2    No Third-Party Beneficiaries ........................................................... 49
    9.3    Entire Agreement ............................................................................. 49
    9.4    Successors and Assigns..................................................................... 50
    9.5    Counterparts ..................................................................................... 50
    9.6    Notices ............................................................................................. 50
    9.7    JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL ........ 51
    9.8    Governing Law ................................................................................ 52
    9.9    Amendments and Waivers ................................................................ 52
    9.10   Severability ...................................................................................... 52
    9.11   Expenses .......................................................................................... 52
    9.12   Interpretation.................................................................................... 52
    9.13   Specific Performance ....................................................................... 53
    9.14   Time Is of the Essence ..................................................................... 53
    9.15   Intentionally Omitted ....................................................................... 53
    9.16   Dispute Costs ................................................................................... 53
    9.17   Seller's Representative...................................................................... 53

Exhibit 1.4

**EXHIBITS**
   Exhibit A   Real Estate Purchase and Sale Agreement
   Exhibit B   Closing Documents

**SCHEDULES**
   Seller Disclosure Schedule
   Buyer Disclosure Schedule

Schedule 2.1: Tangible Personal Property:
Schedule 2.1(h): AR Detail:
Schedule 2.1(l): Tangible Personal Property Leases
Schedule 2.2: Excluded Assets:
Schedule 2.2(g): Excluded Receivables:
Schedule 2.3: Assumed Liabilities:
Schedule 2.7: Allocation:
Schedule 3.5: Financial Statements:
Schedule 3.12(a): Real Estate Purchase Agreement:
Schedule 3.13:  Contracts:
Schedule 3.15: Tax:
Schedule 3.15(h): Non-qualified Deferred Compensation Plan:
Schedule 3.18: Product and Service Warranties:
Schedule 3.20: Employee Roster
Exhibit 3.20: Employee Manual:
Schedule 3.21: Retirement Plan:
Schedule 3.21(f): Employees on Cobra Coverage:
Schedule 3.22: Top 50 Customers and Top 10 Vendors:
Schedule 3.24: Necessary Capital Expenditures:
Schedule 3.25: Insurance Policies:
Exhibit 6.1: Sales & Service Bonus Programs

Exhibit 1.5

**BILL OF SALE AND PURCHASE AGREEMENT**

THIS BILL OF SALE AND PURCHASE AGREEMENT (this "**Agreement**") is entered into and made effective this 6th day of April, 2018 (the "**Closing Date**"), by and between **MNergy, LLC**, an Oklahoma limited liability company ("**Buyer**") and **Aceco Valve, Inc.**, an Oklahoma corporation ("**Seller**") and **Patricia A. Wolf** ("**Wolf**").

**STATEMENT OF PURPOSE**

Buyer has agreed to purchase from Seller, and Seller has agreed to sell to Buyer, substantially all of Seller's assets for the consideration, including Buyer's assumption of certain stated liabilities, and under the terms and conditions of this Agreement.

**ARTICLE 1**
**DEFINITIONS**

Capitalized terms used in this Agreement have the meanings provided in this Article 1 unless defined elsewhere in this Agreement.

"**Accounts Receivable**" means all trade and other accounts receivable and other Indebtedness, including the benefit of all collateral, security, guaranties, and similar undertakings received or held in connection therewith and any claim, remedy, or other right related to the foregoing, owed to Seller as of the Closing Date.

"**Affiliate**" means, with respect to a specified Person, any other Person (who independently or together with one or more of that other Person's Affiliates) that directly or indirectly controls, is controlled by, or is under common control with, the specified Person, and if that Person or "other Person" is a natural person, the spouse of the person and any individual who is related to that person or that person's spouse within the third degree and any Entity that is an Affiliate of any of the foregoing relatives. The term "control" includes, with respect to a Person that is an Entity, (a) the possession, directly or indirectly, of the power to vote 10% or more of the total voting power of the total outstanding securities or other equity or beneficial ownership interests of that Entity, (b) the ownership or control, directly or indirectly, of 20% or more of the value of the total outstanding securities or other equity or beneficial ownership interests of that Entity, (c) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of that Entity, by contract or other means, or (d) being a director, manager, general partner, officer, executor, trustee or fiduciary (or their equivalents) of the Entity that controls the Entity.

"**Agreement**" means this Bill of Sale and Purchase Agreement as defined in the first paragraph of this Agreement.

"**Assumed Liabilities**" is defined in Section 2.3.

"**Assumed Payables**" is defined in Section 2.3.

Exhibit 1.6

"**Balance Sheet**" means the balance sheet of Seller as of April 30, 2015, and the notes thereto, all of which are attached to <u>Schedule 3.5</u>.

"**Balance Sheet Date**" means March 15, 2018.

"**Basket**" is defined in Section 8.4.

"**Book Value**" means, with respect to each Purchased Asset (or, for those Purchased Assets that each have a value of under one thousand dollars ($1,000), category of Purchased Assets), the book value of that asset (or category of assets) net of appropriate reserves, allowances and adjustments contemplated in this Agreement as of the Closing Date, determined in accordance with GAAP as consistently applied by Seller as of the Closing Date and determined as if the Closing Date for this purpose were the last day of Seller's fiscal year and, therefore, is to be treated for this purpose as a reporting date under GAAP, with all reserves (including with respect to the Purchased Receivables, a reasonable reserve for bad debts in accordance with GAAP and Seller's Past Practices), allowances, and adjustments to the book value of the Purchased Assets being made (including any reductions of such value to fair market value for any asset or group of assets required by GAAP, causing the Purchased Asset (and all groups of Purchased Assets, as applicable) to have the lower of their adjusted book value or fair market value on the Closing Date) as would be required as of the end of an accounting period and assuming that Seller has full knowledge of all relevant facts and circumstances relative to each of the Purchased Assets (including its existence, title, and condition, as applicable) through the Closing Date.

"**Business**" means the business conducted by Seller as of either the Balance Sheet Date or the Reference Balance Sheet Date, including the activities carried on by Seller for the purpose of (i) calibration; (ii) repair, and (iii) metrology services.

"**Business Day**" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by law to be closed in Oklahoma City, Oklahoma.

"**Buyer**" is defined in the first paragraph of this Agreement.

"**Buyer Disclosure Schedule**" is defined in the definition of Disclosure Schedule.

"**Cap**" is defined in Section 8.4.

"**Cash Purchase Price**" is defined in Section 2.5(a).

"**Closing**" is defined in Section 2.1.

"**Closing Cash Purchase Price**" is defined in Section 2.5.

"**Closing Date**" is defined in the first paragraph of this Agreement.

"**COBRA**" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Code § 4980B.

Exhibit 1.7

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means information concerning the Business or affairs of Seller, including information relating to customers, clients, suppliers, distributors, investors, lenders, consultants, independent contractors or employees, customer and supplier lists, price lists and pricing policies, cost information, financial statements, schedules, and information, budgets and projections, business plans, production costs, market research, marketing plans and proposals, sales and distribution strategies, manufacturing and production and other processes and techniques, processes and business methods, technical information, pending projects and proposals, new business plans and initiatives, research and development projects, inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, technical data, designs, patterns, marks, names, improvements, industrial designs, mask works, compositions, works of authorship and other Intellectual and Other Intangible Property, devices, samples, plans, drawings and specifications, photographs and digital images, computer software and programming, all other confidential information and materials related to the Business, and all notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for Seller containing or based in whole or in part on any of the foregoing, whether in verbal, written, graphic, electronic or any other form and whether or not conceived, developed or prepared in whole or in part by Seller.

"**Consent**" means any consent, approval, authorization, permission or waiver.

"**Contract**" means any contract, obligation, understanding, commitment, lease, license, franchise, purchase or pending order (including any open orders for inventory), bid or other agreement, whether written or oral and whether express or implied, together with all amendments and other modifications thereto.

"**Customer Deposits and Prepayments**" means cash payments made by customers for goods or services to be delivered in the future and include unapplied credits to any customer account because of customer returns or for any other reason.

"**Disclosure Schedule**" means the disclosure schedule delivered by the applicable Party or Parties concurrently with the execution of this Agreement and hereby is made a component part of this Agreement. The Disclosure Schedule prepared in respect of Article 3 or on which other disclosures are made by Seller or Wolfis referred to herein as the "**Seller Disclosure Schedule**," and the Disclosure Schedule, if any, prepared in respect of Article 4 or on which other disclosures are made by Buyer is referred to herein as the "**Buyer Disclosure Schedule**."

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Employee Benefit Plan**" means any (a) qualified or nonqualified Employee Pension Benefit Plan (including any Multiemployer Plan) or deferred compensation or retirement plan or arrangement, (b) Employee Welfare Benefit Plan or (c) equity-based plan or arrangement (including any stock or other equity interest option, stock or other equity interest purchase, stock or other equity interest ownership, stock or other equity interest appreciation or restricted stock or other equity interest plan) or material fringe benefit or other retirement, severance, bonus, profit-sharing or incentive plan or arrangement.

3

Exhibit 1.8

"**Employee Pension Benefit Plan**" has the meaning set forth in ERISA § 3(2).

"**Employee Welfare Benefit Plan**" has the meaning set forth in ERISA § 3(1).

"**Encumber**" means the existence of, or causing the existence of, an Encumbrance.

"**Encumbrance**" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse or other claim, community property interest, condition, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant, zoning or other restriction of any kind or nature.

"**Entity**" means any corporation, partnership, joint venture or enterprise, limited liability company, unincorporated association, governmental entity or body, trust, estate, labor union, or other entity or organization.

"**Environmental Law**" means any Law relating to the environment, health or safety, including any Law relating to pollution or protection of public health or the environment or worker safety or health or the presence, use, manufacture, production, generation, handling, management, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any material, substance or waste (including Hazardous Substances) limited or regulated by any Governmental Authority.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any Person or trade or business that is or was treated as a single employer with Seller pursuant to Code Sections 414(b) or (c) or ERISA Section 4001(b)(1) and 29 CFR Sections 4001.2 and 4001.3.

"**Estimated Working Capital**" is defined in Section 2.5(b).

"**Excluded Assets**" is defined in Section 2.6

"**Financial Statements**" is defined in Section 3.5.

"**GAAP**" means generally accepted accounting principles, consistently applied, in the United States as provided in pronouncements of the Financial Accounting Standards Board (and its predecessors) and the American Institute of Certified Public Accountants, as in effect on the Closing Date (unless otherwise provided in this Agreement) or, with respect to any financial statements, the date the applicable financial statements were prepared.

"**Governmental Authority**" means any federal, state, local, foreign or other government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing.

Exhibit 1.9

"**Hazardous Substance**" means any material, substance or waste that is limited or regulated by any Governmental Authority, or, even if not so limited or regulated, could or does pose a hazard to the health or safety of the occupants of the Mounds Facility or adjacent properties or any property or facility formerly owned, leased or used by Seller. The term includes asbestos, polychlorinated biphenyls, petroleum products and all materials, substances and wastes regulated by any Governmental Authority or under Environmental Law.

"**Hired Seller Employee**" means each of those Seller Employees who Buyer employs in connection with the Transactions.

"**Indebtedness**" means as to any Person at any time all: (a) obligations of such Person for borrowed money; (b) obligations of such Person evidenced by bonds, notes, debentures or other similar instruments; (c) obligations of such Person to pay the deferred purchase price of property or services (including all obligations under noncompete, consulting or similar arrangements), except trade accounts payable of such Person arising in the ordinary course of business that are not past due by more than 45 days or that are being contested in good faith by appropriate proceedings diligently pursued and for which adequate reserves have been established on the financial statements of such Person; (d) capitalized lease obligations of such Person; (e) indebtedness or other obligations of others guaranteed by such Person or with respect to which such Person is a surety; (f) obligations secured by a lien or other Encumbrance existing on any property or asset owned by such Person; (g) reimbursement obligations of such Person relating to letters of credit, bankers' acceptances, surety or other bonds or similar instruments; (h) Liabilities of such Person relating to unfunded, vested benefits under any Employee Benefit Plan (excluding obligations to deliver stock pursuant to stock options or stock ownership plans); and (i) net payment obligations incurred by such Person pursuant to any hedging agreement.

"**Indemnified Party**" is defined in Section 8.6.

"**Indemnifying Party**" is defined in Section 8.6.

"**Intellectual and Other Intangible Property**" means all: (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications and patent disclosures, together with reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (b) trademarks, service marks, trade dress, logos, trade names and corporate names, together with translations, adaptations, derivations and combinations thereof and including goodwill, both business and personal (including that of Wolf), associated therewith, and applications, registrations and renewals in connection therewith; (c) copyrightable works, copyrights, and applications, registrations and renewals in connection therewith; (d) mask works and applications, registrations and renewals in connection therewith; (e) trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) computer and communication software and software rights systems and programs, in object and source code format (including all data contained on those systems, programs and software and all documentation and software enhancements and customization) and systems; (g) plans, drawings, architectural plans and specifications; (h)

Exhibit 1.10

websites; (i) other intellectual or other intangible proprietary rights and property; (j) copies and tangible embodiments and expressions thereof (in whatever form or medium) and all improvements and modifications thereto and derivative works thereof; and (k) other intellectual and intangible property, including all such property used by Seller as of either the Balance Sheet Date or the Reference Balance Sheet Date in connection with the Business.

"**Inventory**" means all assets held by Seller primarily for sale.

"**IRS**" means the U.S. Internal Revenue Service.

"**Knowledge**" means (a) actual knowledge or (b) knowledge that would be expected to be obtained in the course of diligently performing the applicable Person's duties or after a reasonably comprehensive investigation concerning the matter at issue. Seller is deemed to have Knowledge of a matter if any of its employees or other agents or fiduciaries with responsibility for such matter or any of its directors or officers has, or at any prior time had, Knowledge of such matter.

"**Law**" means any federal, state, local, foreign or other subdivision law, statute, ordinance, regulation, rule, regulatory or administrative guidance, Order, constitution, treaty, principle of common law or other restriction of any Governmental Authority.

"**Liability**" means any liability, duty, claim, obligation or commitment of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**License**" is defined in Section 3.14(d).

"**Loss**" means any loss, claim, demand, diminished value, Order, damage, penalty, fine, cost (including any opportunity cost), settlement payment, Liability, Tax, Encumbrance, diminution of value, expense, fee, mediation, arbitration or court costs or reasonable attorneys' fees and expenses (including any expenses incurred by the Indemnified Party defending third-party claims referred to in Section 8.6).

"**Material Adverse Effect**" means any result, occurrence, fact, change, event, or effect that is or could reasonably be expected to have a material adverse effect on (i) the Business (including Seller's customer base), operations, properties, assets, Liabilities, condition (financial or otherwise) or prospects of Seller; (ii) Seller's ability to consummate the transactions contemplated hereby; or (iii) Buyer's ability to operate the Business immediately after the Closing in the manner and with equal or greater profitability as operated by Seller before the Reference Balance Sheet Date and the Closing Date. "Material Adverse Effect," however, does not include (a) any current or anticipated change, effect, condition or circumstances that is disclosed in the Seller Disclosure Schedule; (b) any change or development arising from seasonal fluctuations in the Business; or (c) any change or effects arising from, or relating to, any action taken as required by this Agreement or as otherwise expressly requested by Buyer.

"**Material Contract**" is defined in Section 3.13.

"**Multi-employer Plan**" has the meaning set forth in ERISA § 3(37) or § 4001(a)(3).

Exhibit 1.11

"**Mounds Facility**" means the real property, including the building(s) and premises, land, and all improvements and easements and other rights appurtenant to such property owned by Wolf on the Reference Balance Sheet Date and located at 2300 Alt Highway 75, Mounds, OK, 74047. Simultaneously with the closing of this transaction, the Mounds Facility shall be sold, transferred and conveyed by Wolf or her Affiliate to Buyer's Affiliate, MNvestments, LLC or a binding agreement for such sale shall be executed and closed on or before April 30, 2018.

"**Mounds Lease**" is the lease of the Mounds Facility as in effect on the Reference Balance Sheet Date, which lease Seller, Wolf and any required Affiliate have terminated as of the Closing Date.

"**Order**" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any court, administrative agency, Governmental Authority or arbitrator.

"**Organizational Documents**" means, with respect to an Entity, (a) the articles of incorporation, bylaws, and any shareholders', security holders', operating, investor rights, voting, right of first refusal and co-sale, confidentiality, management rights, indemnification and other agreement of or between the owners of the Entity relating to the Entity, as applicable, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law, and (c) any amendment or modification to any of the foregoing.

"**Party**" means each of Buyer, Wolf and Seller.

"**Past Practices**" means the applicable business practices of Seller during its three (3) fiscal years that immediately precede the closing and that part of Seller's 2015 fiscal year ending on the Reference Balance Sheet Date.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permit**" means any permit, license, accreditation, certification, or Consent issued by any Governmental Authority or other Person organization or pursuant to any Law.

"**Permitted Encumbrance**" There shall be no Permitted Encumbrances.

"**Person**" means any natural person or Entity.

"**Proceeding**" means any proceeding, charge, complaint, claim, demand, notice, action, suit, litigation, hearing, audit, investigation, arbitration or mediation (in each case, whether civil, criminal, administrative, investigative or informal) commenced, conducted, heard or pending by or before any Governmental Authority, arbitrator, mediator, or licensing or accreditation board, organization, or association.

"**Purchase Price**" is defined in Section 2.5(a).

"**Purchased Assets**" is defined in Section 2.1.

"**Purchased Contracts**" is defined in Section 2.1.

Exhibit 1.12

"**Purchased Inventory**" is defined in Section 2.1.

"**Purchased Permits**" is defined in Section 2.1.

"**Purchased Receivables**" is defined in Section 2.1.

"**Purchased Tangible Personal Property**" means the purchased service equipment, the purchased demo equipment, fixtures, furniture, vehicles, the Purchased Inventory and the Other Purchased Tangible Personal Property as these terms are defined in Section 2.1.

"**Reference Balance Sheet**" means the unaudited consolidated balance sheet of Seller for the period beginning on January 1, 2018 and ending on March 15, 2018, a copy of which is attached hereto as part of Schedule 3.5 and is provided as required by Section 3.5.

"**Reference Balance Sheet Date**" is defined in Section 3.5.

"**Representative**" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, adviser or other representative of such Person, including legal counsel, accountants and financial advisers.

"**Resolution Accountants**" (Intentionally Omitted.)

"**Secured Debt**" means any Indebtedness that is secured by any Encumbrance other than a Permitted Encumbrance on any Purchased Asset.

"**Securities Act**" means the Securities Act of 1933.

"**Seller**" is defined in the first paragraph of this Agreement.

"**Seller Disclosure Schedule**" is defined in the definition of Disclosure Schedule.

"**Seller Employees**" means all employees employed by Seller with respect to the Business, including employees on temporary leave of absence, including family medical leave, military leave, temporary disability or sick leave.

"**Seller Parties**" means both Seller and Wolf.

"**Seller Party**" means each of Seller and Wolf.

"**Seller's Representative**" is defined in Section 9.17.

"**Tangible Personal Property Lease**" means each of those tangible personal property leases identified on Schedule 2.1 under the caption "Tangible Personal Property Leases," which identifies the lessor, the lessee, the lease term, the lease rate, and the lease, sublease, or other Contract(s) related to the property that is the subject of the lease.

Exhibit 1.13

"**Tax**" means (a) any federal, state, local, foreign or other income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock, franchise, utility, severance, unincorporated business, gains, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, general service, alternative or add-on minimum, estimated or other tax of any kind whatsoever, however denominated or computed, including any interest, penalty, or addition thereto, whether disputed or not and (b) Liability for the payment of any amounts of the type described in clause (a) as a transferee or successor, by Contract or from any express or implied obligation to indemnify or otherwise assume or succeed to the Liability of any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or other document or statement relating to Taxes, including any form, schedule or attachment thereto and any amendment or supplement thereof.

"**Third-Party Claim**" is defined in Section 8.6.

"**Transfer**" is defined in Section 2.1.

"**Transactions**" means the transactions consummated or otherwise contemplated by the Transaction Documents.

"**Transaction Documents**" means this Agreement, the Real Estate Purchase and Sale Agreement for the Mounds Facility, and all other written agreements, documents and certificates contemplated by any of the foregoing documents.

"**Uncollected Purchased Receivable**" means any Purchased Receivable that is not collected by Buyer on or before July 6, 2018.

"**WARN Act**" means the Worker Adjustment Retraining and Notification Act of 1988 and any similar or analogous foreign, state or local Laws related to the termination of any employees of Seller or its Affiliates in connection with the Transaction.

"**Wolf**" is defined in the first paragraph of this Agreement.

"**Working Capital**" means as of a particular date, the amount of (a) the Book Value of the Purchased Receivables minus (b) the amount of the Assumed Payables.

"**Working Capital Statement**" (Intentionally Omitted.).

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS AND PURCHASE PRICE

**2.1** **Purchase and Sale of Assets**.  In consideration for the Purchase Price, Seller hereby sells, conveys, transfers, and assigns (collectively "**Transfers**") to Buyer, free and clear of all Encumbrances, all of Seller's rights, title, and interest in and to all of the businesses, assets, and properties (tangible or intangible, wherever located, including goods and other property in

Exhibit 1.14

transit) of Seller of every kind and description (other than the Excluded Assets), existing and owned by Seller (and, to the extent they pertain to the Business, are owned by Wolf or any other Affiliate of Wolf, for which Wolf shall cause such businesses, assets and properties to be conveyed to Buyer on the Closing Date on the same terms as if they were owned by Seller) (all such businesses, assets and properties of Seller and, if applicable, of Wolf or any other Affiliate of Wolf being referred to herein as the "**Purchased Assets**"), to have and to hold unto Buyer, its successors and assigns, forever (the "**Closing**"). The Purchased Assets include, all of the following assets wherever located, but do not include any of the Excluded Assets:

(a)    <u>Machining and Manufacturing Equipment</u>.  All machining and manufacturing equipment and tools, wherever located, all patterns and tooling wherever located, including offsite foundries and forge shops, and all goods in transit, samples, supplies and spare parts and other personal property, whether expensed or capitalized related to machining or manufacturing of the Seller's products (collectively, the "Purchased Machining and Manufacturing Equipment"), including that equipment listed or referenced under the caption 'Purchased Machining and Manufacturing Equipment" on Schedule 2.1 hereto;

(b)    <u>Service Equipment and Tools</u>.   All service equipment, calibration standards, repair equipment, and tools, wherever located, and all goods in transit, samples, supplies and spare parts and other personal property, whether expensed or capitalized related to repair or calibration service, (collectively, the "**Purchased Service Equipment**"), including that equipment listed or referenced under the caption "Purchased Service Equipment" on <u>Schedule 2.1</u> hereto;

(c)    <u>Sales Demonstration Equipment</u>.  All equipment, tools, and fixtures used in the sales demonstration process and for the purpose of selling measurement and calibration equipment, wherever located, and all goods in transit, samples, supplies and spare parts and other personal property, whether expensed or capitalized related to the sales demonstration process, (collectively, the "**Purchased Demo Equipment, Fixtures, and Tools**"), including that demonstration equipment listed or referenced under the caption "Purchased Demonstration Equipment, Fixtures, and Tools" on <u>Schedule 2.1</u> hereto;

(d)    <u>Vehicles</u>.  All vehicles, wherever located, whether expensed or capitalized related to the Business, (collectively, the "**Purchased Vehicles**"), including the vehicles listed or referenced under the caption "Purchased Vehicles" on <u>Schedule 2.1</u> hereto;

(e)    <u>Inventory</u>.  All Inventory, parts, and other items of inventory, including raw materials, goods consigned to vendors or subcontractors, works in process, finished goods, parts, goods in transit, products under research and development, demonstration equipment, inventory on consignment or on order in transit (collectively, the "**Purchased Inventory**"), including that inventory listed or referenced under the caption "Purchased Inventory" on <u>Schedule 2.1</u>, with all new inventory being identified as such thereunder;

Exhibit 1.15

(f)    Other Tangible Personal Property.  All other machinery, equipment, parts, tools, fixtures, furniture, shop, office and other equipment, computer hardware, computer software license agreements, supplies, and other items of tangible personal property (collectively, the "**Other Purchased Tangible Personal Property**"), including that tangible personal property listed or referenced under the caption "Other Purchased Tangible Personal Property" on Schedule 2.1 hereto;

(g)    Intellectual and Other Intangible Property.  All Intellectual and Other Intangible Property related to the Business, including the name "Aceco Valves," "Aceco,"  and any other trade names pertaining to the business and the goodwill of the Business and of Wolf in connection therewith, together with all sales, advertising, promotional and marketing information and materials, all proprietary and other software, websites (including "www.acecovalves.com"), telephone numbers, post office boxes and mailing addresses, fax and pager numbers, e-mail addresses, domain names, domain registrations, URL addresses, any derivation or subpage thereof, and other Internet source identifiers assigned to the business and technology belonging to, used in, or appertaining to the Business, together with all transactions, adaptations, derivations, and combinations thereof, and trade accounts of Seller, Wolf, or other Affiliate of Wolf related to the Business, and the goodwill (personal and business), going-concern value, general intangibles and other intangibles of the Business (collectively, the "**Purchased Intellectual and other Intangible Property**");

(h)    Receivables.  All trade, account and other receivables for invoices dated on or after March 16, 2018, including those receivables listed or referenced under the caption "Receivables" on Schedule 2.1(h), including the benefit of all collateral, security interests, guaranties, and similar undertakings received or held in connection therewith and any claim, remedy or other right related to the foregoing (collectively, the "**Purchased Receivables**");

(i)    Books and Records.  All business and internal records of business, accounting and financial records, books, ledgers, files, correspondence, documents, lists, studies and reports, including customer lists, machining records, manufacturing records, quality manuals, training records, procedures, credit files, supplier and vendor lists and equipment repair, maintenance, service, personnel, payroll, employee benefit, quality control and insurance records, whether written, electronically stored or otherwise recorded (including all such books, records, and electronic backups relating to the Purchased Assets or the business that are necessary or useful for the continued conduct of the Business, whether held by, or for the benefit of Seller and all books and records needed for Buyer to otherwise readily and timely commence operations after Closing and prepare all required returns and reports (collectively, the "**Purchased Books and Records**");

(j)    Marketing Materials.  All sales, advertising, promotional, and marketing information and materials;

Exhibit 1.16

(k)     Contracts.  All rights and interests under all supply contracts, contracts for the sale of goods or services, purchase orders and other contracts, agreements (including vendor agreements), commitments, subscriptions, understandings, leases and licenses (including software and program licenses) to which Seller is a party or under which it has any continuing rights or privileges; all employment, confidentiality, nondisclosure, and other agreements with Hired Seller Employees; and all other rights under any Contracts to which Seller is a party, whether such Contract is written or oral or expressed or implied that are listed or referenced under the caption "Purchased Contracts" on Schedule 2.1 and a copy or a description of each of which is attached to Schedule 3.13 (collectively, the "**Purchased Contracts**");

(l)     Personal Property Leases.   All leases and subleases of tangible or intangible personal property pertaining to the Business as to which Seller is the lessor or sublessor or other Contract pursuant to which Seller holds a possessory interest in such property, together with any options to purchase the underlying property (collectively, the "**Purchased Personal Property Leases**"), and in each case all other rights, subleases, licenses, permits, deposits and profits appurtenant to or related to such leases and subleases or referenced under the caption "Tangible Personal Property Leases" on Schedule 2.1 hereto, which identifies the lessor, the lessee, the lease term, the lease rate, and the lease, sublease, or other Contracts) to which the property is subject;

(m)     Permits.  All assignable Permits, with non-assignable Permits governed by Section 7.5 (collectively, the "**Purchased Permits**");

(n)     Claims and Choses in Action.  All rights to causes of action, lawsuits, judgments, orders, claims and demands of any nature relating to the Business or the Purchased Assets; and all counterclaims, rights of setoff, rights of indemnification and affirmative defenses to any claims that may be brought against Buyer by third parties in respect of the Business or the Purchased Assets the "**Purchased Claims and Choses in Action**");

(o)     Liens.  All liens or rights to file liens related to or arising from the Business or the Purchased Assets (the "**Purchased Liens**");

(p)     Insurance Policies.  All benefits under all insurance policies to which Seller is a party, a named insured or otherwise the beneficiary of coverage other than the tail insurance coverage referenced in Section 7.15 (the "**Purchased Insurance Policies**");

(q)     Refunds, Prepaid Expenses, and Deposits.  All rights to refunds from customers and suppliers, all prepaid expenses and deposits and all rights to condemnation proceeds;

(r)     Leasehold Improvements.   The leasehold improvements made to or located at the Mounds Facility; and

12

Exhibit 1.17

(s)     All Other Property.  All other assets and properties to the extent Seller has any rights thereto or interests therein, whether a present or future interest, an inchoate right or otherwise and whether such properties or assets are tangible or intangible and whether or not of a type falling within any of the categories of assets or properties described above.

Without limiting the foregoing, the Purchased Assets include all of the property identified on Schedule 2.1, hereto.

Except for the personal goodwill of Wolf being purchased hereunder by Buyer, Seller has title to and otherwise owns each of the Purchased Assets immediately before the time they are to be Transferred to Buyer under this Agreement.

**2.2     Excluded Assets**.  Seller will retain ownership of the following assets of Seller (collectively, the "Excluded Assets"):

(a)     Liquid Assets.  All cash, cash equivalents and short-term investments, except Seller shall transfer to Buyer, in such manner as Buyer may reasonably direct, an amount of cash equal to the amount of Customer Deposits or Prepayments as of the Closing;

(b)     Organizational Documents.  Organizational Documents, minute books and Tax Returns;

(c)     Excluded Contracts.  Those Contracts, if any, not listed on Schedule 2.1 under the caption "Purchased Assets," including onerous contracts under GAAP and determined as of the Closing Date (i.e., each of those contracts for which the costs to be incurred to fulfill the contract exceed the economic benefit to be received under the contract);

(d)     Claims and Choses in Action Related to Excluded Assets or Excluded Liabilities.  All rights to causes of action, lawsuits, judgments, orders, claims and demands of any nature relating entirely and exclusively to the Excluded Assets or Excluded Liabilities, and all counterclaims, rights of setoff, rights of indemnification and affirmative defenses to any claims that may be brought against Seller by third parties, with respect to the Excluded Assets or Excluded Liabilities and not any of the Purchased Assets or Assumed Liabilities;

(e)     The Mounds Lease.  This lease agreement is terminated upon the execution of this Agreement;

(f)     Rights of Seller or Wolf under the Transaction Documents.  All rights of Seller or Wolf under any Transaction Document;

(g)     Certain Receivables.  Those receivables listed or referenced under the caption "Excluded Receivables" on Schedule 2.2(g);

Exhibit 1.18

(h)     Employee and Personnel Files.  All personnel or employment records or files, including centrally maintained files and any files maintained by individual supervisors; and

(i)     Other Identified Assets.  Those vehicles, furniture, and other assets, if any, listed on Schedule 2.2

2.3     **Assumed Liabilities**.  In partial consideration for the Purchased Assets and subject to the terms and conditions of this Agreement, Buyer shall assume and agrees to pay, perform and discharge only the following Liabilities of Seller related to the Business (collectively, the "**Assumed Liabilities**"):

(a)     Certain Executory Contracts and Permits.  Subject to Section 2 and the other applicable terms of this Agreement, Liabilities, arising or otherwise related or attributable to that period commencing after the Closing Date under any Purchased Contract, Purchased Personal Property Lease, or Purchased Permit listed on Schedule 2.3.

(b)     Buyer will assume no trade accounts payable incurred by Seller or the Business prior to Closing. All such trade accounts payable will be paid by Seller at or before Closing.

2.4     **Excluded Liabilities**.  Except for the Assumed Liabilities identified in Section 2.3, Buyer is not assuming any obligations or other liabilities of Seller or any Affiliate of Seller. All Liabilities of Seller or any of Seller's Affiliates other than the Assumed Liabilities, as identified and limited by Section 2.3, whether realized or unrealized, accrued or contingent, direct or indirect, and whether arising on or before the Closing Date or any of the obligations or other Liabilities of Seller arising at any time from the conduct of the Business or the ownership or operation of their properties prior to the sale of the Purchased Assets hereunder, or any of the obligations or other Liabilities of Seller arising out of the termination of Seller's business and operations due to its sale of the Purchased Assets hereunder are referred to herein as the "**Excluded Liabilities**," and Buyer has no obligations or other Liabilities with respect thereto and are retained and are to be paid, performed and discharged by Seller. Without limiting the foregoing, Excluded Liabilities include the following Liabilities of Seller:

(a)     Transaction Documents.  All Liabilities under any Transaction Document;

(b)     Taxes.  Subject to Section 2.6 and 7.4, all Liabilities for Taxes (whether federal, state, local or foreign, and whether or not accrued, assessed or currently due and payable), including Taxes incurred in respect of or measured by (i) the sales of goods or services provided, performed, or rendered by Seller, (ii) the wages or other compensation paid by Seller to its employees, (iii) the value of Seller's property (personal as well as real property), (iv) the income of Seller earned or realized on or before the Closing Date, and (v) any gain and income from the sale of the Purchased Assets and other Transactions;

Exhibit 1.19

(c)      Environmental.    All Liabilities under Environmental Laws or that otherwise relate to environmental, ecological, health or safety matters to the extent arising from conditions of the Mounds Facility or the operation of the Business or the Purchased Assets on or before the Closing Date;

(d)      Product and Service Liabilities. All Liabilities associated with services provided, rendered or performed by Seller or products manufactured, sold, leased or delivered by Seller;

(e)      Certain Indemnification Liabilities.    All Liabilities to indemnify any Person (including Wolf) by reason of the fact that such Person was a director, officer, employee, or agent of Seller;

(f)      Trade Accounts Payable.  All trade and other accounts payable other than those that are Assumed Liabilities under Section 2.3 by being listed and otherwise described as Assumed Liabilities under Schedule 2.3, which Buyer hereby is granted the right at any time to assign back to Seller for payment by Seller (and, thereby, cause such reassigned Assumed Payables to become Excluded Liabilities) by Buyer paying Seller in immediately available funds, as Seller's Representative may reasonably direct, the amount by which the Cash Purchase Price was reduced by those re-assigned Assumed Payables.

(g)      Employment Liabilities.    All Liabilities relating to any of Seller's employees or other personnel, including bonuses, severance, and workers' compensation claims, arising out of, or that is related to, any period (or portion of any period) ending on or before the Closing Date;

(h)      Employee Benefit Plans.  All Liabilities associated with Employee Benefit Plans that Seller or any current or former Affiliate of Seller or ERISA Affiliate sponsored, maintained, contributed to, or had an obligation to contribute to, or in which any current or former employee of Seller or of any current or former Affiliate of Seller or ERISA Affiliate currently or formerly participated;

(i)      Non-Assumed Contracts.    Any Liability under or with respect to any Contract or Lease that is not a Purchased Contract (including the Mounds Lease);

(j)      Accrued and Unpaid Expenses.  All accrued and unpaid expenses;

(k)      Commissions.  Any commissions payable to Seller Employees;

(l)      Employee Liability.    All Liabilities for (i) all severance or other termination costs or benefits related to Seller Employees including all accrued or unused vacation time for the current and prior calendar years (A) that are required under the terms of the policies or practices of Seller or its Affiliates, or (B) who are not hired or otherwise employed by Buyer, and (ii) all employment and labor charges of Seller's personnel (including employees and independent contractors), but Buyer will be responsible and otherwise Liable for those Seller Employees that Buyer hires but only for

Exhibit 1.20

the period of time, and under the terms, of employment with Buyer except accrued vacation time and personal day for the current calendar year; and

(m)   Related-Party Liabilities.  Any Liability to an Affiliate of Seller.

**2.5   Purchase Price and Closing Documents.**

(a)   Purchase Price.  In consideration for its purchase of the Purchased Assets and subject to the terms and conditions of this Agreement, Buyer shall pay a **Purchase Price** of Three Million, Two Hundred Fifty Thousand Dollars ($3,250,000.00). The Purchase Price shall be paid to Seller by wire transfer or other immediately available funds as reasonably directed by Seller. Contemporaneously with this Agreement, the parties shall execute the Real Estate Purchase and Sale Agreement referenced in Exhibit 3.12.  The purchase price for the real property described therein is Seven Hundred Fifty Thousand Dollars ($750,000.00).

(b)   Working Capital Payment by Seller.   On the Closing Date, Seller shall deliver to Buyer the sum of Five Hundred Thousand Dollars ($500,000.00) by wire transfer or other immediately available funds as reasonably directed by Buyer (the "Working Capital Payment".)

(c)   Collection of Accounts Receivable.  All receivables confirmed by invoices dated on or before March 15, 2018 and collected by Buyer shall be paid to Seller at the address noted in paragraph 9.6, below.

(d)   Closing Documents. At Closing, Seller shall deliver the Seller Closing Documents listed on Exhibit "B" and Buyer shall deliver the Buyer Closing Documents listed on Exhibit "B"

**2.6   Prorating and Settlement**.  On the date that is sixty (60) days after the Closing Date (the "**Settlement Date**"), the following payments shall be made by Seller or Buyer, as the case may be, to the other Party

(a)   Adjustment with Respect to Utilities.  The aggregate amount of charges for water, electricity, gas, telephone, sewer or other utility or comparable services of the Mounds Facility will be prorated on a per diem basis to the period before and after the Closing Date as more fully described in the first sentence of subsection (c) of this Section 2.6, with those charges arising during, or otherwise related or attributable to, the period up to and including the Closing Date to be paid or otherwise discharged by Seller and those charges arising during, or otherwise related or attributable to, the period after the Closing Date to be paid or otherwise discharged by Buyer.  Seller will be given credit for any utility or real estate deposit paid by Seller which is assigned to Buyer (and for which Buyer has not paid or reimbursed Seller) if the amount is confirmed by the holder of that deposit and the deposit is not included in the Purchased Assets.

(b)   Adjustment with Respect to Contracts. Seller shall promptly pay to Buyer in immediately available funds, payable as reasonably directed by Buyer:  (i) any amounts paid to or for the benefit of Seller from a third party to the extent to which they relate to the Purchased Assets including the Purchased Receivables; and (ii) any amounts, other than Assumed Payables, paid by or on behalf of, or otherwise discharged by or on

Exhibit 1.21

behalf of, Buyer to a third party under any Purchased Contract that are attributable to any period (or any portion of any period) ending on or before the Closing Date (applying the same per diem allocation method described above in subsection (a) of this Section 2.6 to the extent it is not reasonably practicable to identify or otherwise attribute such payments to events, circumstances, or transactions occurring before or after the Closing by closing the books of Seller as of 11:59 p.m. on the Closing Date).

(c)     Taxes.   In conjunction with Section 7.4, all ad valorem property Taxes, personal property taxes and ad valorem taxes (collectively, "**Property Taxes**") assessed with respect to the Purchased Assets for any tax period that includes (but does not end on) the Closing Date shall be apportioned between Buyer and Seller based on the number of days of such period included in the period before (and including the Closing Date) and the number of days of such tax period after the Closing Date.   Buyer shall pay all Property Taxes assessed against or with respect to the Purchased Assets payable after the Closing Date; except Seller shall within seven (7) days after receipt of the Property Tax bills, reimburse Buyer in an amount equal to that portion of the Property Taxes which relate to the period up to and including the Closing Date (determined in accordance with the first sentence in this subsection (c)).

(d)     Accounts Receivable.   The Buyer shall formally account for all accounts receivable issued on or before March 15, 2018. If any such accounts receivable remain unpaid on the Settlement Date, the Seller and Buyer shall agree upon the proper course of action to collect such unpaid receivables without damaging Buyer's goodwill with the customer.

2.7     **Allocation**.   Buyer and Seller shall each allocate the Purchase Price among the Purchased Assets as provided in Schedule 2.7.   Buyer and Seller (a) agree that any such allocation is consistent with the requirements of Code § 1060 and (b) each shall complete and file IRS Form 8594, or a successor form, and any amendments thereto, as and when required by applicable Law consistent with such allocation; except, nothing contained herein requires Buyer or Seller to contest or to litigate in any forum any proposed deficiency or adjustment by any taxing authority or agency which challenges the Allocation.

2.8     **Expenses**.   As provided in Section 2.6, all expenses arising from the conduct of the Business and the ownership and operations of the Purchased Assets shall be prorated between Buyer and Seller as of the Closing Date insofar as possible.   Such expenses include municipal, county, state, and federal Taxes, water charges, sewer, rents, real estate and personal property Taxes, fuel and utility charges, license fees, assessments and other fees, prepaid and deferred expenses, and other expenses relating to the Purchased Assets or the Business.

2.9     **Contingency for Real Estate Purchase and Sale Agreement.**   The Real Estate Purchase and Sale Agreement for the real property on which the Mounds Facility is located  must be delivered at the closing of this transaction. The form of the Real Estate Purchase and Sale Agreement is attached as Exhibit "A".   A copy of the survey for the Mounds Facility is attached as part of Exhibit "A".

Exhibit 1.22

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES REGARDING SELLER, THE BUSINESS, AND THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES

Except as provided in the Seller Disclosure Schedule with reference made to the specific section of this Agreement for which disclosure is made (it being understood that disclosure made by a Seller Party in the Seller Disclosure Schedule in reference to one section of this Agreement will be deemed to be a disclosure for each other section of this Agreement to the extent it is reasonably apparent from the face of the disclosure that it is applicable to those other sections of this Agreement), the Seller Parties hereby jointly and severally represent and warrant as of the Closing Date as follows:

**3.1      Organization, Qualification and Corporate Power**.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of Oklahoma.  Seller has never been a party to a conversion, merger, or consolidation transaction under which it combined with another company.  Seller has delivered to Buyer correct and complete copies of Seller's Organizational Documents.  The minute books and the stock ledger of Seller, in each case as delivered or made available to Buyer, are correct and complete.  The Seller Disclosure Schedule lists and otherwise identifies, in respect of this Section 3.1, each of the jurisdictions other than Oklahoma in which it is qualified to do business.  Seller is duly qualified to do business and is in good standing under the laws of each jurisdiction where it transacts business and is required to register and otherwise "qualifies" to do business under the Law of that jurisdiction.  Seller is in full compliance with its Organizational Documents.

**3.2      Capitalization; No Affiliates**.   Seller has only one class of capital stock outstanding.  Wolf is the only shareholder of Seller. No Person other than Wolf owns any shares of capital stock or the right to acquire any shares of capital stock in Seller. There are no outstanding securities convertible or exchangeable into shares of capital stock or other equity or beneficial ownership interest in Seller.  Seller does not directly or indirectly own or control any direct or indirect equity or beneficial ownership interest in any other Entity and is not otherwise an Affiliate of any Entity.

**3.3      Authority**.   Seller has full power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder.  The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party have been approved by the board of directors of Seller and by all of its shareholders.  This Agreement constitutes the valid and legally binding obligation of Seller and Wolf, enforceable against Seller and Wolf in accordance with the terms of this Agreement.  Upon the execution and delivery by Seller of each Transaction Document to which it is a party, such Transaction Document will constitute the valid and legally binding obligation of Seller, enforceable against Seller in accordance with the terms of such Transaction Document.

18

Exhibit 1.23

**3.4     No Conflicts**.  Neither the execution and delivery of this Agreement nor the performance of the Transactions will, directly or indirectly, with or without notice or lapse of time:  (a) violate any Law to which a Seller Party or any Purchased Asset is subject; (b) violate or cause to lapse any Permit held by Seller or give any Governmental Authority the right to terminate, revoke, suspend or modify any Permit held by Seller; (c) violate any Organizational Document of Seller; (d) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of or give any Person the right to accelerate the maturity or performance of, or to cancel, terminate, modify or exercise any remedy under, any Contract to which a Seller Party is a party or by which a Seller Party is bound or to which any Purchased Asset is subject or under which a Seller Party has any rights or the performance of which is guaranteed by a Seller Party; (e) cause Buyer to have any Liability for any Tax except as provided herein; (f) result in the imposition of any Encumbrance upon any Purchased Asset; or (g) result in any shareholder of Seller having the right to exercise dissenters' appraisal rights.  Seller is not required to notify, make any filing with, or obtain any Consent of any Person in order to perform the Transactions.

**3.5     Financial Statements.**

(a)     Attached to <u>Schedule 3.5</u> are the following financial statements (collectively, the "**Financial Statements**"):  (i) unaudited balance sheet of Seller as of December 31 for each of Seller's 2015, 2016 and 2017 fiscal years and statements of income, changes in stockholders' equity, and cash flow for each of the fiscal years then ended; and (ii) an unaudited year-to-date 2018 consolidated balance sheet (the "**Reference Balance Sheet**") of Seller through March 15, 2018 (the "**Reference Balance Sheet Date**"), and statements of income, changes in stockholders' equity and cash flow for the six-month period then ended.  Except as noted, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, and present fairly the financial condition, the results of operations, and the cash flows of Seller as of and for their respective dates and for the periods referenced in the Financial Statements; except the interim financial statements described in clause (ii) above are subject to normal, recurring year-end adjustments (which will not be, individually or in the aggregate, materially adverse) and lack notes (which, if presented, would not be material).

(b)     The Purchased Books and Records, as supplemented by and subordinated to the Financial Statements, (i) are complete and accurate in all material respects and all transactions to which Seller is or has been a party are accurately reflected therein in all material respects on an accrual basis; (ii)  reflect all discounts, returns and allowances granted by Seller with respect to the periods covered thereby; (iii)  have been maintained in accordance with customary and sound business practices in Seller's industry; (iv)  form the basis for the Financial Statements; and (v)  reflect in all material respects the assets, liabilities, financial position, results of operations and cash flows of Seller on an accrual basis.  All computer-generated reports and other computer output included in the Purchased Books and Records are complete and accurate in all material respects.

Exhibit 1.24

**3.6     Absence of Certain Changes**.  Since the Reference Balance Sheet Date:

(a)     Seller has not sold, leased, transferred or assigned any asset, other than for fair consideration in the ordinary course of business;

(b)     Seller has not experienced any damage, destruction or loss (whether or not covered by insurance) to its property or assets in excess of $15,000;

(c)     Seller has not entered into any Contract (or series of related Contracts) involving the payment or receipt of more than $15,000 or that cannot be terminated without penalty on less than two months' notice, and no Person has accelerated, terminated, modified or canceled any Contract (or series of related Contracts) involving more than $15,000 to which Seller is a party or by which Seller or any of its assets are bound;

(d)     No Encumbrance (other than any Permitted Encumbrance) has been imposed upon any asset of Seller;

(e)     Seller has not made any capital expenditure (or series of related capital expenditures) involving more than $15,000 or made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans or acquisitions) involving more than $15,000;

(f)     Seller has not issued, created, incurred or assumed any Indebtedness (or series of related Indebtednesses) involving more than $15,000 in the aggregate or delayed or postponed the payment of accounts payable or other Liabilities beyond the original due date;

(g)     Seller has not canceled, compromised, waived or released any right or claim (or series of related rights or claims) or any Indebtedness (or series of related Indebtedness) owed to it, in any case involving more than $15,000;

(h)     Seller has not issued any shares of capital stock, or granted any options, warrants or other rights to acquire (including upon conversion, exchange or exercise) any outstanding shares of capital stock in Seller or declared, set aside, made or paid any dividend or distribution with respect to its outstanding shares of capital stock (whether in cash or in kind) or redeemed, purchased or otherwise acquired any of its outstanding shares of capital stock or amended any of its Organizational Documents;

(i)     Seller has not (i) conducted the Business other than in the ordinary course of business or in a manner that is inconsistent with Past Practices, (ii) made any loan to, or entered into any other transaction with, any of its directors, officers or employees on terms that would not have resulted from an arms-length transaction, (iii) entered into any employment Contract or modified the terms of any existing employment Contract, (iv) granted any increase in the base compensation of any of its directors, officers or, except in the ordinary course of business, employees, or (v) adopted, amended, modified or terminated any Employee Benefit Plan or other Contract for the benefit of any of its current or former directors, officers or employees;

20

Exhibit 1.25

(j)      Seller has not made, rescinded or changed any Tax election, changed any Tax accounting period, made a material change in its fiscal or Tax methods of accounting, filed any amended Tax return, entered into any closing agreement, settled any Tax claim, assessment or Liability, surrendered any right to claim a refund of Taxes, consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or taken any other similar action relating to the filing of any Tax Return or the payment of any Tax in respect of, or that otherwise relates to, any of the Purchased Assets (whether directly or indirectly);

(k)      There has not been any Proceeding commenced nor, to the Knowledge of Seller, threatened or anticipated relating to or affecting Seller, the Business or any asset owned or used by Seller;

(l)      There has not been (i) any loss of any material customer, distribution channel, sales location or source of supply of Inventory, utilities or contract services or the receipt by Seller of any notice that such a loss may be pending, (ii) any occurrence, event or incident related to Seller outside of the ordinary course of business or (iii) any material adverse change in the Business operations, properties, prospects, assets, Liabilities or condition (financial or otherwise) of Seller and no event has occurred or circumstance exists that is not public knowledge that may result in any such material adverse change;

(m)      Neither Seller nor Wolf has agreed or committed to any of the foregoing; and

(n)      Neither Wolf nor any Affiliate of Wolf have entered into transactions with, or received any dividends or other payments or Transfer of property from Seller.

**3.7      No Undisclosed Liabilities**.  Seller has no Liability (and to Seller Parties' Knowledge, no basis exists for any Liability), including any Liability that any of the Purchased Assets are subject to payment or repayment or that otherwise Encumbers any of the Purchased Assets, except for (a) Liabilities under Purchased Contracts, excluding Liabilities for any breach of any executory Purchased Contract, and (b) current Liabilities incurred in the ordinary course of business since the Reference Balance Sheet Date (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of Contract, breach of warranty, tort, infringement or violation of Law).

**3.8      Title to and Sufficiency of Assets**.  Seller has good and marketable title to, or a valid leasehold interest in, the Purchased Assets, free and clear of any Encumbrances except Permitted Encumbrances.  The Purchased Assets include all tangible and intangible property and assets (except for the Excluded Assets) necessary for the continued conduct of the Business after Closing in the same manner as conducted by Seller before the Reference Balance Sheet Date and before the Closing.  The transfer of the Purchased Assets hereunder will convey to Buyer good, valid and indefeasible title to the Purchased Assets, free and clear of any Encumbrances except Permitted Encumbrances.

Exhibit 1.26

**3.9     Tangible Personal Property; Condition of Purchased Assets**.  Schedule 2.1 lists each item of the Purchased Tangible Personal Property that has a Book Value of $1,000 or more and lists into appropriate groups of assets those items of Purchased Tangible Personal Property that have a Book Value of less than $1,000 and the Book Value of each such group.  To the Knowledge of Seller Parties, the Mounds Facility and the Purchased Tangible Personal Property and all other relevant Purchased Assets (including computer software, computer systems, telecommunication equipment and software, and related technology and products) are structurally sound, free from material defects, in good operating condition and repair and adequate for the uses to which they are being put.  None of the Purchased Assets (nor the Mounds Facility) is in need of maintenance or repairs, except for ordinary, routine maintenance and repairs that are not material in nature or cost.  All of the tangible assets owned or leased by Seller (including the Purchased Assets) are located on the premises of the Mounds Facility or, in accordance with Seller's customary practice; the motor vehicles owned by Seller and are included in the Purchased Assets.  Except for the Excluded Assets, Wolf's capital stock in Seller, or as provided in the Seller Disclosure Statements, neither Wolf nor any Affiliate of Wolf other than Seller owns any assets or other property related to the Business.

**3.10     Work-in-Progress**.  All Work-in-Progress that is reflected on the Balance Sheet, the Reference Balance Sheet or the accounting records of Seller as of the Closing Date represent or will represent valid rights to payment arising from products or services actually sold, utilized, performed or rendered, as the case may be, by Seller in the ordinary course of business.  Unless paid before the Closing Date or included in the Accounts Receivable (and, therefore, constitute Excluded Assets), all Work-in-Progress is and will be as of the Closing Date collectible when billed to the applicable customer without contest, claim or right to set-off.

**3.11     Inventory**.  The Inventory consists of a quality and quantity usable for its intended purpose and saleable in the ordinary course of business consistent with Past Practices, except for slow-moving and obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value on the accounting records of Seller.  All Inventory not written off has been valued at the lower of cost or market value. The quantities of each type of Inventory are reasonable in the present circumstances of Seller and are not materially more or less than normal Inventory levels necessary to conduct the Business in the ordinary course consistent with Past Practices.  All of the Inventory is located on the premises of the Mounds Facility or, in accordance with Seller's Past Practices, the motor vehicles owned by Seller that are included in the Purchased Assets are located at the Mounds Facility.

**3.12     Real Property.**

(a)     Attached as Schedule 3.12(a) hereto is the Real Estate Purchase and Sale Agreement for the sale of the Mounds Facility to Buyer's Affiliate.

(b)     The Mounds Facility is the only real property that is owned, leased, subleased or otherwise occupied or used by Seller.  The **Mounds** Facility is not subject to any rights of way, building use restrictions, title exceptions, variances, reservations or limitations of any kind or nature, except as disclosed and identified as a Permitted Encumbrance on the Seller Disclosure Schedule.  All buildings, plants, structures and other improvements for the Mounds Facility are located on the property subject to the

22

Exhibit 1.27

Real Estate Purchase and Sale Agreement and lie wholly within the boundaries of the **Mounds** Facility and do not encroach upon the property, or otherwise conflict with the property rights, of any other Person. Except as set forth in the Seller Disclosure Schedule, the **Mounds** Facility complies with all Laws (including zoning requirements, and building, health and safety, and other laws, including The Americans with Disabilities Act of 1990, as amended), and neither Seller nor any of its Affiliates has received any notifications from any Governmental Authority or insurance company recommending or requiring improvements to the **Mounds** Facility or any other actions relative to the **Mounds** Facility. Seller has delivered to Buyer, Schedule 3.12(a) to this Agreement, a true and complete copy of each title insurance policy, opinion, abstract, survey and appraisal relating to the Mounds Facility in the possession of Seller, Wolf or any of their affiliates.  The property subject to the **Mounds** Lease is currently insured under a comprehensive commercial liability policy and a casualty policy and Seller Parties Know of no condition that would cause such policies to be cancelled.  Seller is not a party to or bound by any Contract (including any option) for the purchase or sale of any real estate interest or any Contract for the lease to or from Seller of any real estate interest not currently in possession of Seller.

(c)    To the Knowledge of Seller and Wolf, all buildings, structures, fixtures, building systems and equipment, and all components thereof, including the roof, foundation, load-bearing walls, and other structural elements thereof, heating, ventilation, air conditioning, mechanical, electrical, plumbing and other building systems, environmental control, remediation and abatement systems, sewer, storm, and waste water systems, irrigation and other water distribution systems, parking facilities, fire protection, security and surveillance systems, and telecommunications, computer, wiring and cable installations, included in the **Mounds** Facility (the "**Improvements**") are in good condition and repair and sufficient for their intended use in the Business.  There are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any respect with the use or occupancy of the Improvements or any portion thereof in the operations currently conducted or intended to be conducted thereon.

(d)    To the Knowledge of Seller Parties, there is no condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting the **Mounds** Facility or any portion thereof or interest therein. There is no injunction, decree, order, writ or judgment outstanding, or any claim, litigation, administrative action or similar proceeding, pending or threatened, relating to the ownership, lease, use or occupancy of the **Mounds** Facility or any portion thereof, or the operation of business currently conducted or intended to be conducted thereon.

(e)    To the Knowledge of Seller Parties, none of the **Mounds** Facility or any portion thereof is located in a flood hazard area (as defined by the Federal Emergency Management Agency).

Exhibit 1.28

(f)     There is no amount due and payable to any architect, contractor, sub-contractor, materialman, or other Person for work or labor performed for, or materials or supplies provided to, or in connection with, the **Mounds** Facility or any portion thereof for or on behalf of Seller which is delinquent.  There is no work or labor being performed for, or materials or supplies being provided to, or in connection with the **Mounds** Facility or any portion thereof, or to be performed or supplied for or on behalf of Seller before the Closing, other than routine maintenance and repair work which costs and expenses, which Seller shall pay in full before the Closing.

(g)     There are no pending property insurance claims with respect to the **Mounds** Facility or any portion thereof.  Neither Seller nor any of Seller's Affiliates has received any notice from any insurance company or any board of fire underwriters (or Entity exercising similar functions) with respect to the **Mounds** Facility or any portion thereof: (i) requesting Seller or make any repairs, alternations, improvements, or other work with respect to the **Mounds** Facility be performed that has not been completed in full or (ii) notifying Seller or any of Seller's Affiliates of any defects or inadequacies in the **Mounds** Facility which would materially adversely affect the insurability of the **Mounds** Facility or the premiums for the insurance thereof.

**3.13    Contracts.**

(a)     Schedule 3.13 lists (including contract name, parties and date) the following Contracts to which Seller is a party or by which Seller is bound or to which any asset of Seller is subject or under which Seller has any rights or the performance of which is guaranteed by Seller (collectively, with the Leases, Licenses and Insurance Policies, the "**Material Contracts**" and each one a "**Material Contract**"):

(i)     each Contract (or series of related Contracts) that involves delivery or receipt of products or services, that was not entered into in the ordinary course of business, or that involves expenditures or receipts in excess of $10,000;

(ii)     each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements entered into in the ordinary course of business and for which the remaining amounts to be paid are less than $10,000 and with terms of less than one year), including each Lease and License;

(iii)     each licensing agreement or other Contract with respect to Intellectual and Other Intangible Property, including any agreement with any current or former employee, consultant, or contractor regarding the appropriation or the non-disclosure of any Intellectual and Other Intangible Property;

(iv)     each collective bargaining agreement and other Contract to or with any labor union or other employee representative of a group of employees;

24

Exhibit 1.29

(v)      each joint venture, partnership or Contract involving a sharing of profits, losses, costs or Liabilities with any other Person;

(vi)     each Contract containing any covenant that purports to restrict the business activity of Seller or limit the freedom of Seller or, to Seller's Knowledge, any of Seller's employees, to engage in any line of business or to compete with any Person;

(vii)    each Contract providing for payments to or by any Person based on sales, purchases or profits, other than direct payments for goods;

(viii)   each Contract entered into other than in the ordinary course of business that contains or provides for an express undertaking by Seller to be responsible for consequential, incidental or punitive damages;

(ix)     each Contract (or series of related Contracts) for capital expenditures in excess of $10,000;

(x)      each written warranty, guaranty or other similar undertaking with respect to contractual performance other than in the ordinary course of business;

(xi)     each Contract for Indebtedness in excess of $10,000 and each promissory note, contract or facility, for loans to Seller or in respect of which any of Seller's assets (including Purchased Assets) are Encumbered;

(xii)    each employment, nondisclosure, confidentiality, or consulting Contract or other Contract (A) relating to the employment of, or the performance of services by, any employee, consultant or other Person other than ordinary course, at-will written or oral offers or agreements terminable without notice and without the payment of any severance or penalty and other than employment arrangements required by Law, (B) pursuant to which Seller is or may become obligated to make any severance, termination, or similar payment to any current or former employee or director, other than with respect to agreements listed or described in the Schedule 3.13 as applicable to all Seller Employees generally, or applicable to all Seller Employees in specified jurisdictions outside of the United States, (C) pursuant to which Seller is or may become obligated to make any bonus or similar payment to any current or former employee or director, other than with respect to Purchased Contracts listed or described in Schedule 2.1, or (D) pursuant to which Seller may be required to provide, or accelerate the vesting of, any payments, benefits, or equity rights upon the occurrence of any of the Transactions; and

(xiii)   each Contract not terminable without penalty on less than six-month's notice.

Exhibit 1.30

(b)     Seller has delivered to Buyer a correct and complete copy of each written Material Contract.  Each Material Contract, with respect to Seller, is legal, valid, binding, enforceable, in full force and effect and will continue to be so on identical terms after the Closing Date except where the express terms thereof prohibit assignment of the Seller's rights and interest therein.  Each Material Contract, with respect to the other parties to such Material Contract, to the Knowledge of Seller, is legal, valid, binding, enforceable, in full force and effect and will continue to be so on identical terms immediately after the Closing Date (i.e., the Closing will have no effect on the continued validity, effectiveness, and enforceability and continued application of the Material Contracts). Seller is not in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification or acceleration, under any Material Contract.  To the Knowledge of the Seller Parties, no other party is in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification or acceleration, under any Material Contract.  No party to any Material Contract has repudiated any provision of any Material Contract.

(c)     None of the Purchased Contracts are subject to contingencies or other terms as to cause them to be, or need to be, accounted for as a loss or onerous contract under GAAP, under the assumptions and methodology to be applied pursuant to the definition of Book Value under Article 1, and none of the Purchased Contracts subject Seller (and, therefore upon assumption hereunder, Buyer) to any warranty claims or any accounting provisions under GAAP, applying the above-described assumptions and methodology.

**3.14    Intellectual and Other Intangible Property.**

(a)     Seller owns or has the right to use all Intellectual and Other Intangible Property necessary or prudent for, or otherwise used in, the operation of the Business as presently conducted.  Each item of Intellectual and Other Intangible Property owned, licensed or used by Seller immediately before the Closing will be owned, licensed or available for use by Buyer on identical terms and conditions immediately following the Closing.  Seller has taken all necessary and prudent action to maintain and protect each item of Intellectual and Other Intangible Property that it owns, licenses or uses.  Each item of Intellectual and Other Intangible Property owned, licensed or used by Seller is valid and enforceable and otherwise fully complies with all Laws applicable to the enforceability thereof.

(b)     Seller has not violated or infringed upon or otherwise come into conflict with any Intellectual and Other Intangible Property of third parties, and neither Seller nor any of its Affiliates has received any notice alleging any such violation, infringement or other conflict.  To the Knowledge of Seller, no third party has infringed upon or otherwise come into conflict with any Intellectual and Other Intangible Property of Seller.

(c)     [Intentionally left blank].

26

Exhibit 1.31

(d)     The Seller Disclosure Schedule identifies, in respect of this Section 13.14(c), each item of Intellectual and Other Intangible Property that any Person other than Seller owns and that Seller uses in the Business, pursuant to license, agreement or permission (a "**License**").  With respect to each item of Intellectual and Other Intangible Property required to be identified in the Seller Disclosure Schedule:  (i) to the Knowledge of Seller, such item is not subject to any Order; (ii) to the Knowledge of Seller, no Proceeding is pending or is threatened or anticipated that challenges the legality, validity or enforceability of such item; and (iii) Seller has not granted any sublicense or similar right with respect to the License relating to such item.

**3.15    Tax.**

(a)     Since its incorporation, Seller has been an S corporation as defined in Section 1361(a)(1) of the Code.  Seller and Wolf each has duly and timely filed with the appropriate Governmental Authorities all Tax Returns that they are required to have filed.  All Tax Returns filed by Seller, and all income Tax Returns filed by Wolf, are true, correct and complete in all respects.  All Taxes owed (or to be remitted) by Seller (or income Taxes owed by Wolf), whether or not shown on any Tax Return, have been paid to the proper Governmental Authority.  No event has occurred which could impose on Buyer any successor or transferee liability for any Taxes in respect of Seller.  No claim has been made by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to the payment, collection or remittance of any Tax (or that Wolf is or may be subject to the payment, collection or remittance of any income Tax) of that jurisdiction or is otherwise subject to taxation by that jurisdiction.  There are no Encumbrances on any of the assets of Seller that arose in connection with, or otherwise relate to, any failure (or alleged failure) to pay any Tax.  Schedule 3.15:  (i) contains a list of all states, territories and other jurisdictions (whether domestic or foreign) in which Seller has filed a Tax Return at any time during the six-year period ending on the Closing Date, (ii) identifies those Tax Returns of Seller that have been audited, (iii) identifies those Tax Returns of Seller that currently are the subject of audit or examination by any Governmental Authority, (iv) lists all rulings and similar determinations with respect to Taxes requested or received by Seller, and (v) identifies those Tax Returns of Seller that are due to be filed within ninety 90 days after the Closing Date.  Seller has delivered or made available to Buyer true, correct and complete copies of all Tax Returns filed by, and all examination reports, and statements of deficiencies assessed against or agreed to by, Seller (as separately designated) during the three-year period ending on the Closing Date.

(b)     Seller has withheld or collected, and paid to the proper Governmental Authority, all Taxes required to have been withheld or collected and remitted, and complied with all information reporting and backup withholding requirements, and has maintained all required records with respect thereto, in connection with amounts paid or owing to any employee, customer, creditor, stockholder, member, independent contractor, or other third party.

Exhibit 1.32

(c)     There is no basis for any Governmental Authority to, and neither Seller nor Wolf expects any Governmental Authority to, assess any additional Taxes for any period for which Tax Returns of Seller have been filed.  There is no dispute or claim concerning any Liability for Taxes paid, collected or remitted by Seller either (i) claimed or raised by any Governmental Authority in writing or (ii) as to which Seller or Wolf has Knowledge.

(d)     Seller has not waived any statute or period of limitations with respect to any Tax or agreed, or been requested by any Governmental Authority to agree, to any extension of time with respect to any Tax.  No extension of time within which to file any Tax Return of Seller has been requested, granted or currently is in effect.

(e)     Seller has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code § 6662.  Seller has never been a member of any "affiliated group" as defined in Code § 1504(a) (or any similar group defined under a similar provision of state, local or foreign Law) filing a consolidated federal, state, local or foreign income Tax Return.  Seller has no Liability for Taxes of any Person under Treasury Regulation §1.1502-6 (or any similar provision of any other Law, including state or local unitary Tax Law), as a transferee or successor, by Contract, or otherwise.

(f)     The unpaid Taxes of Seller (i) as of the Reference Balance Sheet Date, do not exceed the reserve for Liability for Taxes (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Reference Balance Sheet (rather than in any notes thereto) and (ii) will not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller in filing its Tax Returns.

(g)     Seller has not directly or indirectly participated in any transaction (including, the transactions contemplated by this Agreement) that would constitute (i) a "reportable transaction" or "listed transaction" as defined in Treasury Regulation § 1.6011-4 or (ii) a "tax shelter" as defined in Code § 6111 and the Treasury Regulations thereunder.

(h)     Schedule 3.15h lists each agreement, contract, plan or other arrangement (whether or not written and whether or not an Employee Benefit Plan) to which Seller (as separately designated) is a party that is a "nonqualified deferred compensation plan" within the meaning of Code §409A and the Treasury Regulations promulgated hereunder. Each such nonqualified deferred compensation plan (i) complies, and is operated and administered in accordance, with the requirements of Code §409A, the Treasury Regulations promulgated hereunder and any other IRS guidance issued thereunder and (ii) has been operated and administered in good faith compliance with Code §409A from the period beginning on January 1, 2010.

(i)     To the Knowledge of Seller, the execution and delivery of this Agreement and the performance of the Transactions will not cause Buyer to have any Liability for any Tax.

Exhibit 1.33

(j)     Seller has timely made all filings required to be made by it in connection with any foreign bank account or other for foreign account.  No closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign law) has been entered into by or with respect to Seller.

**3.16    Legal Compliance**.  Except as set forth on the Seller Disclosure Schedule, Seller is, and since January 1, 2014, has been, in compliance in all material respects with all applicable Laws and Permits.  Except as set forth on the Seller Disclosure Schedule, no Proceeding is pending, nor since January 1, 2008, has been filed or commenced, against Seller alleging any failure to comply with any applicable Law or Permit.  No event has occurred or circumstance exists that (with or without notice or lapse of time) may constitute or result in a violation by Seller of any Law or Permit.  Neither Seller nor any of its Affiliates has received any notice or other communication from any Person regarding any actual, alleged or potential violation by Seller of any Law or Permit or any cancellation, termination or failure to renew any Permit held by Seller.  The Seller Disclosure Schedule, in respect of this Section 3.16, contains a complete and accurate list of each Permit held by Seller or that otherwise relates to the Business or any asset owned or leased by Seller and states whether each such Permit is transferable.  Each Permit listed or required to be listed on the Seller Disclosure Schedule under the caption "Permits," is valid and in full force and effect.  Each Permit listed or required to be listed on the Seller Disclosure Schedule is renewable for no more than a nominal fee and, to the Knowledge of Seller, there is no reason why such Permit will not be renewed.  The Permits listed on the Seller Disclosure Schedule constitute all of the Permits necessary to allow Seller to lawfully conduct and operate the Business as currently conducted and operated and to own and use its assets as currently owned and used.

**3.17    Litigation**.  There is no Proceeding pending or, to the Knowledge of Seller Parties, threatened or anticipated relating to or affecting (a) Seller or the Business or any asset owned or used by it or (b) the Transactions.  To the Knowledge of Seller, no event has occurred or circumstance exists that would reasonably be expected to give rise to or serve as a basis for the commencement of any such Proceeding.  The Proceedings listed in the Seller Disclosure Schedule have not resulted in and are not reasonably likely to result in any Material Adverse Effect to the Purchased Assets.  There is no outstanding Order to which Seller or any asset owned or used by it is subject.  The Seller Disclosure Schedule lists all Proceedings pending at any time since January 1, 2008, in which Seller has been named as a defendant (whether directly, by counterclaim or as a third-party plaintiff) and all Proceedings pending at any time after January 1, 2008, in which Seller has been a plaintiff.  The Seller Disclosure Schedule, in respect of this Section 3.17, lists all Orders in effect at any time since January 1, 2012, to which Seller has been subject or any asset owned or used by Seller is subject.

**3.18    Product and Service Warranties**.  Each product manufactured, sold, leased or delivered and each service provided by Seller has been in conformity with all express or implied applicable contractual commitments and all express and implied warranties.  Seller has no Liability (and there is no basis for any present or future Proceeding against Seller that could give rise to any Liability) for replacement, repair, correction, or reformation of any such product or service or other damages in connection therewith.  The only warranties extended by Seller in respect of products Seller sells are those of the manufacturer of the product.  No product manufactured, sold, leased or delivered or any service provided, performed, or rendered by Seller

29

Exhibit 1.34

is subject to any guaranty, warranty, indemnity, or other Liability.  Seller has had no Liability (and there is no basis for any present or future Proceeding against it that could give rise to any Liability) arising out of any injury to any individual or property as a result of the ownership, possession or use of any product manufactured, sold, leased or delivered or any service provided, performed, or rendered by Seller.  Attached as <u>Schedule 3.18</u> are copies of Seller's standard terms and conditions of sale or lease as products or services rendered, including applicable guaranty, warranty, and indemnity provisions.

    **3.19    Environmental**.  Seller and each of its predecessors have complied and are in compliance with all Environmental Laws.  Seller has obtained and complied with, and is in compliance with, all Permits that are required pursuant to any Environmental Law for the occupation of its facilities and the operation of the Business.  All such required Permits are listed on the Seller Disclosure Schedule both in respect of Section 3.16 and this Section 3.19.  Seller has received no written or oral notice, report or other information regarding any actual or alleged violation of any Environmental Law, or any Liabilities or potential Liabilities, including any investigatory, remedial or corrective obligations, relating to it or its facilities arising under any Environmental Law.  None of the following exists at any property or facility currently owned, leased or operated by Seller and none of the following existed at any property or facility previously owned, leased or operated by Seller or any of its predecessors at or before the time Seller or any of its predecessors ceased to own, lease or operate such property or facility:  (i) underground storage tanks, (ii) asbestos-containing material in any form or condition, (iii) materials or equipment containing polychlorinated biphenyls, or (iv) landfills, surface impoundments, or disposal areas.  Neither Seller nor any of its predecessors has  treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any substance, including any Hazardous Substance (except in the ordinary course of business and in accordance with applicable Law), or owned, leased or operated any property or facility (and no such property or facility is contaminated by any such substance) in a manner that has given or would give rise to any Liability, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, pursuant to any Environmental Law.  Neither this Agreement nor the Transactions will result in any Liability for site investigation or cleanup, or notification to or Consent of any Person, pursuant to any "transaction-triggered" or "responsible property transfer" Environmental Laws.  Seller has not, either expressly or by operation of law, assumed or undertaken any Liability, including any obligation for corrective or remedial action, of any other Person relating to any Environmental Law.  No facts, events or conditions relating to the past or present facilities, owned or leased properties or operations of Seller will prevent, hinder or limit continued compliance with any Environmental Law, give rise to any investigatory, remedial or corrective obligations pursuant to any Environmental Law, or give rise to any other Liabilities pursuant to any Environmental Law, including any relating to onsite or offsite releases or threatened releases of Hazardous Substances, or personal injury, property damage or natural resources damage.  Seller has delivered all environmental reports, audits, and other material environmental documents relating to their or their predecessors' or Affiliates' past or current properties, facilities, or operations that are in their possession, custody, or under its reasonable control or access.

Exhibit 1.35

**3.20    Employees**.  Schedule 3.20 accurately states the name, job title, current rate of compensation, date of commencement of employment, and any change in compensation since August 1, 2015 and sick and vacation leave that is accrued and unused with respect to each Seller Employee.  A copy of Seller's Employee Manual, as in effect on the Reference Balance Sheet Date; and immediately before Closing, is attached hereto as Exhibit 3.20.  A copy of Seller's commission plans and programs as in effect on the Reference Balance Sheet Date and immediately before Closing is attached as Exhibit 3.20.  To the Knowledge of Seller, there are no Seller Employees (i) whose actions or failure to act has created a safety hazard to the operations of Seller or to any Seller Employees or other Persons, (ii) who have engaged in inappropriate behavior in connection with the Business, including harassment or discrimination, and (iii) who have engaged in theft, fraud, or other materially dishonest behavior.  Seller is not Liable for any payment to any trust or other fund or to any governmental or administrative authority with respect to unemployment compensation benefits, social security, social benefits, or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistent with Past Practices).  There are no pending claims against Seller under any workers compensation plan or policy or for long-term disability.  Seller is not, nor has Seller been, a party to or bound by any collective bargaining agreement or other labor union contract.  Seller has not experienced any strike, slowdown, picketing, work stoppage, employee grievance process, claim of unfair labor practice or other collective bargaining dispute.  There is no lockout of any employees by Seller, and no such action is contemplated by Seller.  Seller has not committed any unfair labor practice.  There are no Proceedings pending or, to Seller's Knowledge, threatened, between Seller and any of its employees, or any works council or similar body, which controversies have or could reasonably be expected to result in a Proceeding, including claims for compensation, severance, vacation time, vacation pay, or pension benefits, or any other claim pending in any court or administrative agency from any current or former employee or any other Person arising out of Seller's status as employer or purported employer or any workplace practices or policies whether in the form of claims for discrimination, harassment, unfair labor practices, grievances, wage and hour violations, wrongful discharge, or otherwise.  To the Knowledge of Seller, (a) no event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute and (b) there is no organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Seller.  To the Knowledge of Seller, no employee, officer or director of Seller is a party to or bound by (or has in the past been in violation of) any agreement that (i) could adversely affect the performance of his or her duties as an employee, officer or director other than for the benefit of Seller, (ii) could adversely affect the ability of Seller to conduct the Business, (iii) restricts or limits in any way the scope or type of work in which he or she may be engaged other than for the benefit of Seller or (iv) requires him or her to transfer, assign or disclose information concerning his or her work to anyone other than Seller.  To the Knowledge of Seller, no officer or employee of Seller has any plans to accept employment with any Person other than Buyer after Closing.  Each employee of Seller has signed Form I-9 verifying his or her eligibility to work in the United States, and Seller is in compliance with the Immigration Reform and Control Act and any similar Laws.  None of Seller Employees is on long-term disability leave.  None of the Seller Employees has entered into a Contract with Seller that obligates Seller to make or provide any severance or other termination payments or other benefits.

Exhibit 1.36

**3.21    Employee Benefits.**

(a)      Schedule 3.21 lists each Employee Benefit Plan that Seller maintains or to which Seller contributes or otherwise participates in for the benefit of, or which otherwise covers, the Seller Employees, has any obligation to contribute or has any other Liability (each a "**Seller Plan**" and collectively the "**Seller Plans**").

(b)      All contributions (including all employer contributions and employee salary reduction contributions) that are due have been paid to each Seller Plan that is an Employee Pension Benefit Plan and all contributions for any period ending on or before the Closing Date that are not yet due have been paid to each Seller Plan or accrued in accordance with the past custom and practice of Seller.  All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each Seller Plan that is an Employee Welfare Benefit Plan.

(c)      Each Seller Plan that is an Employee Pension Benefit Plan meets the requirements of a "qualified plan" under Code § 401(a), has received a favorable determination letter from the IRS that it is such a "qualified plan," and, to the Knowledge of Seller, there are no facts or circumstances that could result in the revocation of such determination letter.

(d)      With respect to each current or former Employee Benefit Plan that Seller or any ERISA Affiliate maintains or has maintained or to which any of them contributes, has contributed, or has been required to contribute or has or had any Liability:

(i)      No such Employee Benefit Plan is or has been subject to Code § 412 or Section 302 or Title IV of ERISA.

(ii)      There has been no "prohibited transaction" (as defined in ERISA § 406 or Code § 4975) with respect to any such Employee Benefit Plan, and no "fiduciary" (as defined in ERISA § 3(21)) has any Liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Employee Benefit Plan.  No Proceeding with respect to the administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of Seller, threatened or anticipated.  To the Knowledge of Seller, there is no basis for any such Proceeding.  There are no pending, or to the Knowledge of Seller, threatened or anticipated claims with respect to any such Employee Benefit Plan other than routine claims for benefits.

(iii)      Seller has not incurred and, to the Knowledge of Seller, is not reasonably likely to incur any Liability to the PBGC or otherwise under Title IV of ERISA (including any withdrawal liability as defined in ERISA § 4201) or under the Code with respect to any such Employee Benefit Plan that is an Employee Pension Benefit Plan.

Exhibit 1.37

(e)     Neither Seller nor any ERISA Affiliate contributes, has contributed to, has been required to contribute, or as a result of the Transactions will be required to contribute to any Multiemployer Plan or has any Liability (including withdrawal liability as defined in ERISA § 4201) under any Multiemployer Plan.  Seller does not maintain or contribute, has not maintained or contributed, has not been required to contribute, nor as a result of the Transactions will be required to contribute to any Employee Welfare Benefit Plan providing medical, health, or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses, or their dependents (other than in accordance with COBRA).

(f)     Schedule 3.21(f) separately lists the name, address and health coverage of (i) each individual currently receiving COBRA coverage under Seller's health plans, (ii) each individual currently in a COBRA election period under Seller's health plans, and (iii) each Seller Employee who is not a Hired Seller Employee.

(g)     Seller does not have an employee savings plan.

**3.22    Customers and Suppliers**.  With respect to each of Seller's 2015, 2016, and 2017, fiscal years, Schedule 3.22 lists (a) the 50 largest (by dollar volume) customers of the Business during each such period (showing the dollar volume for each) and (b) the twenty largest (by dollar volume) suppliers of the Business during each such period (showing the dollar volume for each).  Since the Balance Sheet Date, no customer or supplier listed on Schedule 3.22 has notified Seller of a likely decrease in the volume of purchases of products or services from, or sales to, Seller, or a decrease in the price that any such customer is willing to pay for products or services of Seller, or an increase in the price that any such supplier will charge for products or services sold to Seller, or of the bankruptcy or liquidation of any such customer or supplier.

**3.23    Transactions with Affiliates**.  Except as disclosed as "Transactions with Affiliates" in the Seller Disclosure Schedule, since January 1, 2012, neither Wolf nor any officer, director or employee of Seller or any of its Affiliates or any Affiliate of Wolf has (i) owned any interest in any asset used in the Business, (ii) been involved in any business transaction with Seller or (iii) engaged in competition with Seller.  Except as provided in the Seller Disclosure Schedule, in respect of this Section 3.23, neither Wolf nor any officer, director or employee of Seller or any of its Affiliates (i) is a party to any Contract with, or has any claim or right against, Seller or (ii) has any Indebtedness owing to Seller.  Except as provided in the Seller Disclosure Schedule, in respect of this Section 3.23, Seller (A) has no claim or right against Wolf or any officer, director or employee of Seller or any of its Affiliates or any Affiliate of Wolf or (B) has any Indebtedness owing to any officer, director or employee of Seller or any of its Affiliates.

**3.24    Capital Expenditures**.  Except as set forth on Schedule 3.24, there are no capital expenditures that Seller currently plans to make or anticipates will need to be made during its current fiscal year or the following fiscal year in order to comply with existing Laws or to continue operating the Business following the Closing in the manner currently conducted by Seller.  Seller has not foregone or otherwise materially altered any planned capital expenditure as a result of Seller's decision to enter into the Transactions or otherwise sell or dispose of the Business or the Purchased Assets.

Exhibit 1.38

**3.25    Insurance**.  Schedule 3.25 sets forth the following information with respect to each Insurance Policy:  the name of the insurer, the policy number, the name of the policyholder, the period of coverage, and the amount of coverage.  Seller has delivered to Buyer true and complete copies of each insurance policy and each pending application of Seller for any insurance policy.  All premiums relating to the insurance policies have been timely paid.  Schedule 3.25 describes any self-insurance arrangements affecting Seller.  Seller has been covered during the past ten years by insurance in scope and amount customary and reasonable for the businesses in which it has engaged during such period.  Seller is in compliance with all obligations relating to insurance created by Law or any Contract to which Seller is a party.  Seller has delivered or made available to Buyer copies of loss runs and outstanding claims as of a recent date with respect to each insurance policy.

**3.26    Solvency**.  Seller is not now insolvent and will not be rendered insolvent by any of the Transactions.  As used in this section, "insolvent" means that the sum of the debts and other probable Liabilities of Seller exceeds the present fair saleable value of Seller's assets.  Immediately after giving effect to the Transactions: (i) Seller will be able to pay its Liabilities (including the Excluded Liabilities) as they become due in the usual course of business, (ii) Seller will not have unreasonably small capital with which to conduct its present or proposed business, (iii) Seller will have assets (calculated at fair market value) that exceed its Liabilities, and (iv) taking into account all pending and threatened litigation, final judgments against Seller in actions for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Seller will be unable to satisfy any such judgments promptly in accordance with their terms and all other obligations of Seller.

**3.27    No Brokers' Fees**.  Seller has no Liability for any fee, commission or payment to any broker, finder or agent with respect to the Transactions.

**3.28    Disclosure**.  No representation or warranty contained in this Article 3 and no statement in any Schedule prepared by Seller related thereto contains any untrue statement of material fact or omits to state any material fact necessary to make the statements therein not misleading.  To the Knowledge of Seller, there is no impending change in the Business or in Seller's competitors, relations with employees, suppliers or customers, or in any Laws affecting the Business that (i) has not been disclosed in the Schedules to the representations and warranties in this Article 3 and (ii) has resulted in or is reasonably likely to result in any Material Adverse Effect.

**3.29    Computer and Technology Security**.  Seller has taken reasonable steps to safeguard the information technology systems utilized in the operation of its business (including the Business), including the implementation of procedures to ensure that such information technology systems are free from any disabling codes or instructions, timer, copy protective device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," drop dead device," "virus," or other software routines or hardware components that in each permit unauthorized access or the unauthorized disablement or unauthorized erasure of data or other software by a third party, and to date there have been no successful unauthorized intrusions or breaches of the security of Seller's information technology systems.

Exhibit 1.39

**3.30   Data Privacy**.  Seller has complied with, and is in compliance with, all Laws allocable or pertaining to data privacy, data security, or personal information, including the Federal Trade Commission's Fair Information Principles.  Seller has complied with, and is in compliance with, its policies applicable or pertaining to privacy, data security, or personal information.  Seller has not experienced any incident in which personal information or other data was or may have been stolen or improperly, and Seller has no Knowledge of the likelihood of any of the foregoing, including any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.

**3.31   Non-competition Covenants**.  Except as to their obligations to Buyer under this Agreement or the Transaction Documents, neither Seller nor Wolf (nor to the Knowledge of Seller or Wolf, any of the employees of Seller) is subject to any non-competition covenant or other similar agreement restricting Seller's, or Wolf's ability (or to Seller's or Wolf's Knowledge, the ability of any employee of Seller) to engage in the Business (or activities that are or otherwise would be related to the Business) and, following the Closing, Buyer and its Affiliates will not be subject to any such non-competition covenant or restrictive agreement by virtue of Buyer's purchase of the Purchased Assets.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES REGARDING BUYER

Except as provided in the Buyer Disclosure Schedule with reference made to the specific section of this Agreement for which disclosure is made (it being understood that disclosure made by Buyer in reference to one section of this Agreement will be deemed to be a disclosure for each other section of the Agreement to the extent it is reasonably apparent from the face of the disclosure that it is applicable to those other sections of this Agreement), Buyer hereby represents and warrants as of the Closing Date as follows:

**4.1   Organization and Authority**.  Buyer is a limited liability company duly organized and validly existing under the laws of Oklahoma.  Buyer has full requisite power and authority as a limited liability company to execute and deliver this Agreement and to perform its obligations hereunder.  The execution and delivery by Buyer of this Agreement to which Buyer is a party and the performance by Buyer of the Transactions have been duly approved by all requisite limited liability company action of Buyer.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with the terms of this Agreement.  Upon the execution and delivery by Buyer of this Agreement, this Agreement will constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with the terms hereof.

**4.2   No Conflicts**.  Neither the execution and delivery of this Agreement nor the performance of the Transactions will, directly or indirectly, with or without notice or lapse of time:  (i) violate any Law to which Buyer is subject; (ii) violate any Organizational Document of Buyer; or (iii) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of or give any Person the right to accelerate the maturity or performance of, or to cancel, terminate, modify or exercise any remedy under, any Contract to which Buyer is a party or by which Buyer is bound or the performance of which is guaranteed by Buyer.  Buyer need

Exhibit 1.40

not notify, make any filing with, or obtain any Consent of, any Person in order to perform the Transactions.

**4.3     Litigation**.  There is no Proceeding pending or, to the Knowledge of Buyer, threatened or anticipated against Buyer relating to or affecting the Transactions.

**4.4     No Brokers' Fees**.  Buyer has no Liability for any fee, commission or payment to any broker, finder or agent with respect to the Transactions for which Seller could be Liable.

**4.5     Tax Liens**. No tax liens have been filed against Buyer in any jurisdiction.

**ARTICLE 5**
**NON-COMPETITION AND NON-SOLICITATION BY SELLER**

**5.1     Definitions**.  As used in this Article 5, the following terms have the meanings given to such terms below:

(a)     "**Competitive Activity**" means being employed by, providing consulting or other services to, or being an agent or independent contractor of, a Competitor.

(b)     "**Competitor**" means any person or business that provides any Products and Services in the Territory.

(c)     "**Customer**" means, as of a particular time, any Person who, at any time within the 24-month period preceding such time (or at any time within the 24-month period preceding the Closing), was a customer of the Business.

(d)     "**Buyer Employee**" means, as of a particular time, any Person who is or, at any time within the 24-month period preceding such time (or at any time within the 24-month period preceding the Closing), was an employee or member of management of, or otherwise provided substantial services to, Buyer or any of its Affiliates or Seller.

(e)     "**Products and Services**" means any products sold or services provided, performed, or rendered by Buyer or Seller for which Buyer or Seller, as applicable, derived one percent (1%) or more of Buyer's or Seller's gross annual revenue (or those of any of its Affiliates) during, in the case of Buyer, any of Buyer's preceding three (3) fiscal years or, in the case of Seller, during any of the three years preceding the Closing Date and includes product sales, collection, and repair of industrial measurement and scale equipment, as the services related to selling, calibrating, and repairing industrial scale and measurement equipment and, in general, the sale of each of these products and services described in the definition of Business in Article I.

(f)     "**Restricted Period**" means the three (3) year period beginning on the Closing Date.

(g)     "**Territory**" means that area within:

(i)     The State of Oklahoma (all counties are listed on Schedule 5.1(f);

36

Exhibit 1.41

       (ii)      a two hundred (200) mile radius of **Mounds**;

       (iii)     a one hundred (100) mile radius of each location at which Seller performed any services for a Customer during any of the three years preceding the Closing Date and within a one hundred (100) mile radius of each location at which Buyer performed any services for a Customer during any of the three years following the Closing Date; and

       (iv)     North and South America.

Except, during the first year following the Closing Date, **Territory** shall mean anywhere in the world.

**5.2**    **Covenants by Seller and Wolf**.  Except as otherwise provided in Section 5.3, during the Restricted Period, neither Seller nor Wolf or any of their respective Affiliates will engage (nor will they allow any of their Affiliates to engage and will cause their Affiliates to not engage) in any Competitive Activity or acquire or otherwise own or hold any equity or beneficial ownership interest in any Competitor, including not engaging (whether on his or her own behalf or on behalf of any other Person) in any activities similar to those described in subsections (a) through (e) below, except in furtherance of Buyer's business with the prior written approval of Buyer:

       (a)     provide any Products and Services in the Territory;

       (b)     solicit any Customer for purposes of marketing, selling or providing Products and Services to such Customer;

       (c)     accept as a customer any Customer for purposes of marketing, selling or providing Products and Services to such Customer;

       (d)     induce or attempt to induce any Buyer Employee to terminate their employment with Buyer or its Affiliates; or

       (e)     interfere with the business relationship between a Customer, Buyer Employee or supplier and Buyer or its Affiliates.

**5.3**    **Exceptions; Publicly-Traded Securities**.  Notwithstanding anything to the contrary in this Article 5, other than Sections 5.2(b)-5.2(e), which shall apply in all circumstances, this Article 5 (other than Sections 5.2(b)-5.2(e), which shall apply in all circumstances), does not apply to the purchase or acquisition by Seller, Wolf or any Affiliate of either of a class of a company's securities that are listed on a national or regional securities exchange or traded on the over the counter market if the price of those securities is quoted at least once a week in the print edition of either the *Wall Street Journal* or the *New York Times*, unless (and, therefore, this Section 5.3 will not apply) Seller, Wolf, or their respective Affiliates acquire or otherwise own or hold any such securities that would cause them to collectively hold more than one percent (1%) of the total outstanding number of those securities.

Exhibit 1.42

**5.4**     **Reasonableness of Restrictions**.  Seller and Wolf each agree that the covenants in this Article 5 are reasonable.  Notwithstanding the foregoing, in the event that any provision of this Article 5 is determined by a court to be invalid or unenforceable, such court may, and is hereby authorized to, reduce or limit the terms of such provision to allow it to be enforced. Without limiting the foregoing, in the event that the absence of a time limitation in this Article 5 is determined by a court to be unreasonable, such court may, and is hereby authorized to, impose the maximum limitation as it deems reasonable.

**5.5**     **Injunctive Relief; Expenses**.  Seller and Wolf each acknowledge that Buyer and its Affiliates will suffer irreparable harm in the event that Seller or Wolf breach any of their obligations under this Article 5 and that monetary damages will be inadequate to compensate Buyer and its Affiliates for such breach.  Accordingly, Seller and Wolf each agree that, in the event of a breach by the Seller or Wolf of any of their obligations under this Article 5, Buyer shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, and expedited discovery for the purpose of seeking relief, in order to prevent or to restrain any such breach (and their Affiliates agree to waive any requirement for the securing or posting of any bond in connection with such remedies).  Buyer shall be entitled to recover their costs incurred in connection with enforcing this Article 5, including reasonable attorneys' fees and expenses.

**5.6**     **Accounting for Profits**.  If any Seller or Wolf violates any of its obligations under this Article 5, Buyer and its Affiliates shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration's or benefits that Seller or Wolf, or any other Affiliates of Wolf, directly or indirectly has realized or may realize as a result of, growing out of or in connection with any such violation.

**5.7**     **Blue Penciling.** If, at the time of enforcement of any provisions of this Article 5, a court or arbitrator, panel, or other applicable tribunal holds or otherwise determines that any of the restrictions or other provisions stated in this Article 5 are unenforceable under the circumstances then existing, the Parties agree that the maximum period, scope, or geographical area that is enforceable under such circumstances will be, and hereby is, substituted in lieu of the stated period, scope, or geographic area determined to be unenforceable, and that tribunal is, and will be, allowed to reform and otherwise revise the restrictions contained on this Article 5 to cover the maximum period, scope, and geographic area permitted and otherwise enforceable by Law or, failing to do that, to strike through and otherwise delete the terms and other provisions the tribunal determines to be unenforceable to allow this Article 5 to be enforced to the maximum extent possible.

## ARTICLE 6
## EMPLOYEES AND EMPLOYEE BENEFITS

**6.1**     **Salaries and Benefits**.  Seller is solely responsible and Liable for all of its Liabilities to Seller Employees, former employees, and their respective dependents and for compliance with all applicable Laws (none of which are Assumed Liabilities).  Without limiting the generality of the preceding sentence, Seller is solely responsible and Liable for all Liabilities to its employees through and (to the extent applicable), after the Closing relating to (a) the payment of compensation and wages (including salaries, commissions, and bonuses) and payroll

Exhibit 1.43

taxes through the Closing; (b) the payment of all benefits, including severance, accrued vacation, pension, and profit sharing contributions, seniority rights, and other forms of benefits of any type or nature on account of said employees' employment by Seller, including the provision of health plan continuation coverage in accordance with the requirements of COBRA and ERISA §§ 601 through 608; (c) the payment of any termination or severance payments (including any that arise as a result of the consummation of the Transactions); (d) any claims made or incurred by Seller Employees and their beneficiaries under any of the Seller Plans; (e) except as otherwise provided herein, satisfying Seller's Liabilities on account of employment or former employment by Seller; (f) performing any obligations required by the Fair Labor Standards Act of 1938, the Equal Pay Act, applicable wage and hour Laws, or any other applicable Laws.  On or before Closing, Seller shall pay each Seller Employee who becomes a Hired Seller Employee all of the following:  (i) the entire amount of any bonuses for each year ending on or prior to the Closing Date, (ii) the pro rata amount of any bonuses accrued from the beginning of the year in which the Closing Date occurs until the Closing Date for such individual, and (iii) any commissions that would have been earned and received for sales made by such Hired Seller Employee on or before Closing if such employee had continued employment with Seller through the date when such amounts would otherwise have been paid had the Closing and his or her termination of employment not occurred (and irrespective of any Seller policies that require employment at the time of payment or receipt of payment from the customer before payment to the employee).  A copy of all of Seller's sales commission plans or programs are attached hereto as Exhibit 6.1.

      **6.2**    **WARN Act Obligations**.  Seller agrees to timely perform and discharge all applicable requirements under the WARN Act arising as a result of the consummation of the Transactions.  Seller is solely responsible and Liable for any and all penalties and payments to employees required under the WARN Act and similar state and local Laws as a result of any insufficient notice by Seller.  On the sixty-first day after the Closing Date, Buyer will be solely responsible and Liable for performing and discharging all requirements under the WARN Act and similar state and local Laws for the notification of Buyer's employees and state and local Governmental Authorities.  Seller will be solely responsible and Liable for performing and discharging all requirements under the WARN Act and similar state and local Laws for the notification of Hired Seller Employees whose employment with Buyer is terminated on or before the sixtieth day after the Closing Date.  Accordingly, if Buyer terminates a Hired Seller Employee on or before the sixtieth day after the Closing Date, Seller will be responsible and shall pay all costs and expenses (including any penalties) associated with that employee's termination, including any severance obligation or the payment of any compensation that the employee may be entitled to under the WARN Act or any other Law for any period following the date the employee is terminated by Buyer.   Buyer and Seller acknowledge that their respective obligations under this Section 6.2 may be affected by certain hiring or termination decisions made by each of them during the 90-day period before and after the Closing Date.  Accordingly, Buyer and Seller shall cooperate in good faith to provide sufficient information regarding their intentions to enable the other to discharge its obligations under this Section 6.2 in a timely manner.  Each of Buyer and Seller shall provide the other with sufficient information to enable the identification of and timely and accurate notification to any employee to whom a notification obligation might attach.

Exhibit 1.44

**6.3    Seller's Retirement and Savings Plans.**

(a)    All Hired Seller Employees who are participants in Seller's retirement plans will retain their accrued benefits under Seller's retirement plans as of the Closing Date, and Seller (or Seller's retirement plans) will retain sole Liability for the payment of such benefits as and when such Hired Seller Employees become eligible therefor under such plans. All Hired Seller Employees will become fully vested in their accrued benefits under Seller's retirement plans as of the Closing Date, and Seller shall so amend such plans if necessary to achieve this result. Seller shall cause the assets of each Seller Plan to equal or exceed the benefit liabilities of such Seller Plan on a plan-termination basis as of the Closing.

(b)    Seller shall cause its savings plan to be amended, if necessary, in order to provide that the Hired Seller Employees will be fully vested in their accounts under such plan as of the Closing Date and all payments thereafter will be made from such plan as provided in the plan.

**6.4    General Employee Provisions**.  Each of Seller and Buyer shall give all notices required by Law and take whatever other actions with respect to the plans, programs and policies described in this Article 6 as may be reasonably required for it to carry out its obligations described in this Article 6.  Each of Seller and Buyer shall provide the other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required for it to carry out its obligations described in this Article 6.  If any arrangement described in this Article 6 is determined by any Governmental Authority to be prohibited by Law, Seller and Buyer shall modify such arrangement to as closely as possible reflect such arrangement and retain the allocation of economic benefits and burdens to the Parties contemplated herein in a manner that is not prohibited by Law. Buyer will not have any responsibility, liability or obligation, whether to Seller Employees, former employees, their beneficiaries or to any other Person, with respect to any Seller Plans (including the establishment, operation or termination thereof and the notification and provision of COBRA coverage extension) maintained by Seller, except as required by COBRA.

**6.5    No Third Party Beneficiaries**.  No  provision of this Article 6 shall create any third-party beneficiary rights in any Person, including employees or former employees (including any beneficiary or dependent thereof) of Seller or Buyer or any of their respective Affiliates or other representatives of such employees or former employees, or trustees, administrators, participants or beneficiaries of any Employee Benefit Plan.  No provision of this Article 6 shall create such third-party beneficiary rights in any such Person in respect of any benefits that may be provided, directly or indirectly, under any Employee Benefit Plan or arrangement, including the currently existing plans of Seller and Buyer.

Exhibit 1.45

## ARTICLE 7
## POST-CLOSING COVENANTS

The Parties agree as follows with respect to the period following the Closing:

**7.1     Payment of Excluded Liabilities**.  Seller shall pay, perform and discharge the Excluded Liabilities as and when due including any Tax Liabilities that Seller may have with respect to the Closing of the Transactions and which are not to be paid by the Buyer as provided in Section 7.4, below..

**7.2     Payment of Assumed Liabilities**.  Buyer shall pay, perform and discharge the Assumed Liabilities as and when due.

**7.3     Bulk Transfer Compliance**.  Inasmuch as Buyer is to assume the Assumed Liabilities and Seller is to pay, perform and discharge the Excluded Liabilities, Buyer and Seller hereby mutually agree to waive compliance with the provisions of any bulk transfer or sales laws, to the extent applicable to the Transactions.

**7.4     Tax Covenants.**

(a)     Payment of Transfer Taxes.  Seller shall, at its own expense, file when due all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, including interest and penalties thereon but excluding all registration and other non-income Taxes and fees (including interest and penalties thereon) imposed on the Transfer by Seller to Buyer of title to the Purchased Vehicles, and the registration of title by Buyer of title to the Purchased Vehicles, with respect to the Transactions, which vehicle transfer and registration Taxes and fees (the "**Vehicle Taxes**") are to be borne entirely by Buyer (collectively, such Taxes and fees other than Vehicle Taxes, the "**Transfer Taxes**") and, if required by applicable Law, Buyer shall, and shall cause its Affiliates to, join in the execution of any such properly completed Tax Returns and other documentation.  Seller shall pay and otherwise be responsible for all other Transfer Taxes when due and relieve Buyer from any such Liabilities.

(b)     Tax Reporting for Employees.  If Buyer determines, in its sole discretion, to utilize either of the standard procedure or alternate procedure set forth in Revenue Procedure 2004-53 for wage reporting of the transferred employees in the calendar year which contains the Closing Date (the "**Current Calendar Year**"), then (i) Buyer shall promptly notify Seller of the procedure chosen for such wage reporting for the Current Calendar Year, (ii) Seller agrees to utilize such procedure for such wage reporting for the Current Calendar Year, and (iii) Seller shall provide the employee information reasonably necessary for Buyer to properly complete its wage reporting in accordance therewith.  If Buyer determines, in its sole discretion, that it qualifies as a "successor employer" within the meaning of Code §§ 3121(a)(1) and 3306(b)(1) (and the applicable Treasury Regulations promulgated thereunder), then Seller shall provide the employee information reasonably necessary for Buyer to properly determine the applicable wage limitations and amounts for the transferred employees for the Current Calendar Year.

Exhibit 1.46

(c)     <u>Cooperation on Tax Matters</u>.  Buyer and Seller shall cooperate, as and to the extent reasonably requested by any other Party, in connection with the filing and preparation of Tax Returns related to the Purchased Assets and any Proceeding related thereto.

(d)     <u>Allocation of Ad Valorem Taxes</u>.  As provided in Section 2.6, each of Seller and Buyer shall be responsible for its pro rata share of the current year's personal property, real property, ad valorem and similar Taxes with respect to the Purchased Assets, prorated on a calendar year basis as of the Closing Date.  Notwithstanding the foregoing, Seller shall be responsible for and shall pay (including, to the extent applicable, reimburse Buyer within ten (10) days after receipt of a copy of the applicable Tax bill) all Taxes (whether or not accrued, assessed or payable on the Closing Date) for all prior calendar years and periods before and including the Closing Date.

**7.5     Consents**. This Agreement will not constitute an assignment, attempted assignment or agreement to assign any Contract or Permit to the extent that any attempted assignment or agreement to assign such Contract or Permit without the Consent of any Person would constitute a breach thereof or would impair the rights of Seller or Buyer thereunder and such Consent is not obtained.  If any Consent set forth or required to be set forth on the Seller Disclosure Schedule has not been obtained before or at the Closing, then Seller shall, and Wolf shall cause Seller to, use its best efforts to obtain such Consent.  Until such Consent is obtained, or the Contract or Permit to which such Consent relates is novated or terminated, to the extent permissible under such Contract or Permit, Buyer will be entitled to receive all of Seller's benefits under such Contract or Permit and, to the extent it receives such benefits, shall perform all of the obligations of Seller under such Contract or Permit.  Seller shall, at Buyer's request, do all such acts and things as Buyer may reasonably request to enable due performance of such Contract or Permit and to provide for Buyer the benefits, subject to the obligations, of such Contract or Permit.  Without limiting the generality of the foregoing, Seller shall provide all reasonable assistance to Buyer (at Buyer's request) to enable Buyer to enforce its rights under such Contract or Permit.

**7.6     Mail and Receivables**.  After the Closing, Seller and Wolfshall reasonably cooperate with Buyer in the collection of the Purchased Receivables and, at Buyer's request, will confirm to any account debtor with respect thereto Purchased Receivables have been assigned to Buyer.  Seller and Wolf hereby irrevocably authorize Buyer to receive and open all mail and other communications received by Buyer at the municipal or mail address of the Mounds Facility **[is there also a PO Box?]**, and addressed or directed to Seller, or Patricia Wolf and, to the extent relating to the Business, the Purchased Assets, or the Assumed Liabilities to act with respect to such communications in such manner as Buyer may elect.  If any such communication does not relate to the Business, the Purchased Assets or the Assumed Liabilities, Buyer will forward such communication to Seller's Representative.  Seller and Wolf shall promptly deliver to Buyer the original of any mail or other communication received by Seller or Wolf (or any other Affiliates) after the Closing that relates to the Business, the Purchased Assets or the Assumed Liabilities.  Seller and Wolf hereby irrevocably authorize Buyer after the Closing to endorse, without recourse, the name of the applicable Seller on any check made out to Seller or Wolf received by Buyer on account of any of the Purchased Assets or the Business.  After the Closing, Seller and Wolf shall promptly remit or cause to be remitted to Buyer any payment relating to the Business

42

Exhibit 1.47

or the Purchased Assets (including payments on the Purchased Receivables) that Seller or Wolf(or any other Affiliate of Wolf) receives.  Seller shall use Seller's best efforts, to transfer Seller's lock box or post office box, if any, to Buyer, effective as of the Closing.

      **7.7**    **Litigation Support**.  If any Party is evaluating, pursuing, contesting or defending against any Proceeding in connection with (a) any Transaction or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or before the Closing Date involving Seller, each other Party shall cooperate with such Party and such Party's counsel in the evaluation, pursuit, contest or defense, make available its personnel, and provide such testimony and access to its books and records as may be necessary in connection therewith.  The evaluating, pursuing, contesting or defending Party shall reimburse each other Party for its out-of-pocket expenses related to such cooperation (unless the contesting or defending Party is entitled to indemnification therefor under Section 8.1 without regard to Section 8.4).

      **7.8**    **Transition**.  After the Closing, at Buyer's request, Seller shall cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing before the Closing, including relationships with lessors, lessees, employees, Governmental Authorities, licensors, licensees, customers, suppliers and others, and Seller shall satisfy the Excluded Liabilities in a manner that is not detrimental to any of such relationships; except that Buyer shall reimburse Seller for its out-of-pocket expenses related to such cooperation (unless Buyer is entitled to indemnification with respect to the matter for which Buyer is seeking Seller's cooperation under Section 8.1without regard to Section 8.4).  Seller shall refer to Buyer all inquiries relating to the Business.

      **7.9**    **Confidentiality**.  The Seller Parties shall, and shall cause their Affiliates and Representatives to, maintain the confidentiality of the Confidential Information at all times, and shall not, directly or indirectly, use any Confidential Information for its own benefit or for the benefit of any other Person or reveal or disclose any Confidential Information to any Person other than authorized Representatives of Buyer, except in connection with this Agreement or with the prior written consent of Buyer.  The covenants in this Section 7.9 do not apply to Confidential Information that (a)  is or becomes available to the general public through no breach of this Agreement by either Seller Party or any of their Affiliates or Representatives or, to the Knowledge of either Seller Party, breach by any other Person of a duty of confidentiality to Buyer or (b) Seller is required to disclose by applicable Law, in which case the Seller Parties will use their best efforts to advise Buyer of the content of the disclosure before it is made (subject to necessary and appropriate confidentiality restrictions and compliance with applicable Law); except that Seller shall notify Buyer in writing of such required disclosure as much in advance as practicable in the circumstances and cooperate with Buyer to limit the scope of such disclosure. At any time that Buyer may request, Seller shall, and shall cause its Affiliates and Representatives to, turn over or return to Buyer all Confidential Information in any form (including all copies and reproductions thereof) in their respective possession or control.

Exhibit 1.48

**7.10    Retention of and Access to Books and Records**.  Buyer shall retain for a period consistent with Buyer's record-retention policies and practices the Books and Records delivered to Buyer. Buyer also shall provide Seller and its Representatives reasonable access thereto, during normal business hours and on at least three Business Days' prior written notice, to enable them to prepare financial statements or Tax Returns or deal with Tax audits.  Seller shall provide Buyer and its Representatives reasonable access to those books and records that are Excluded Assets, during normal business hours and on at least three Business Days' prior written notice, for any reasonable business purpose specified by Buyer in such notice.

**7.11    Change of Seller's Name**.  At Closing and no later than five (5) business days following the Closing Date, Seller shall deliver to the Secretary of State (or other applicable Governmental Authority responsible for name or assumed names of Entities) of each State in which it is incorporated or organized or authorized to do business proper documentation to change its name, which name must not include any of the following words "Aceco" or "Valve" or "Manufacturing" or "Machining," or any combination thereof and shall thereafter cease to use any of the foregoing words in its name.

**7.12    Severance Liability of Certain Seller Employees**.  As provided and otherwise contemplated by Section 2.4, Seller shall promptly pay all severance costs related to Seller Employees who are not hired or otherwise employed by Buyer.

**7.13    Title Documents**.  Seller shall deliver to Buyer any additional instruments of transfer (including certificates of title of motor vehicles), in form and substance reasonably satisfactory to Buyer to effect the transfer by and to vest and fully convey unencumbered title in each of the Purchased Assets to Buyer.

**7.14    Intentionally Omitted.**

**7.15    Tail Insurance Coverage**.  Seller shall maintain, for at least twelve (12) months after Closing, the level of insurance coverage in effect on the Reference Balance Sheet Date (or acquire and maintain comparable insurance coverage) for Seller Employees and for Seller's operations and ownership of the Purchased Assets before the Closing, with respect to any claims made by or against, or Proceedings involving, any such Seller Employees or operations and ownership of the Purchased Assets before Closing, concerning acts or omissions (or alleged acts or omissions), occurring on or before the Closing Date (or related to any other Excluded Liability) and shall fund and otherwise pay any retention, deductible or self-insured portion with respect to any such claim and the defense and the related costs and expenses (including reasonable attorneys' fees) thereof.

## ARTICLE 8
## LOSSES AND INDEMNIFICATION

**8.1    Indemnification by the Seller Parties**.  After the Closing, subject to the terms and conditions of this Article 8, each of the Seller Parties is jointly and severally Liable for, shall indemnify and hold harmless Buyer and its Affiliates and Representatives from, and shall pay and reimburse Buyer and its Affiliates and Representatives and otherwise be responsible and liable for, all Losses directly or indirectly relating to or arising from: (a) any breach or

Exhibit 1.49

inaccuracy or any allegation of any third party that, if true, would be a breach or inaccuracy of any representation or warranty made by either Seller Party in this Agreement; (b) any breach of any covenant or agreement of a Seller Party in this Agreement, including the covenant to pay, perform or otherwise discharge all Excluded Liabilities as and when due and any other Liability arising out of or in connection with non-compliance with any "bulk sales," "bulk transfer" or any similar Law other than as a result of any failure by Buyer to discharge any Assumed Liability; or (c) any claim by either Seller Party or any other Person claiming through or on behalf of either Seller Party arising out of or relating to any act or omission by Buyer or any other Person in reliance upon written instructions from or notices given by either Seller Party.

   **8.2   Indemnification by Buyer**.   After the Closing, subject to the terms and conditions of this Article 8, Buyer shall indemnify and hold harmless Seller from, and pay and reimburse Seller and otherwise be responsible and liable for, all Losses, directly or indirectly, relating to or arising from:  (a) any breach or inaccuracy or any allegation of any third party that, if true, would be a breach or inaccuracy of any representation or warranty made by Buyer in this Agreement; (b) any breach of any covenant or agreement of Buyer in this Agreement, including the covenant to pay, perform or otherwise discharge all Assumed Liabilities as and when due; or (c) any claim by Buyer or any other Person claiming through or on behalf of Buyer arising out of or relating to any act or omission by either Seller Party or any other Person in reliance upon written instructions from or notices given by Buyer.

   **8.3   Survival and Time Limitations**.   All representations, warranties, covenants and agreements of the Parties in this Agreement or any other certificate or document delivered pursuant to this Agreement will survive, and may be enforced after, the Closing.  If the Closing occurs, neither Seller Party will have any Liability with respect to any claim for any breach or inaccuracy of any representation or warranty in this Agreement or any other certificate or document delivered pursuant to this Agreement, or any covenant or agreement in this Agreement to be performed and complied with before the Closing Date, unless Buyer notifies Seller of such a claim on or before the date that is eighteen (18) months after the Closing Date; except that (a) any claim relating to Section 3.20 (employees) may be made at any time until the date five years after the Closing Date, (b) any claim relating to any Section 3.15 (taxes), 3.18 (product and service warranties), Section 3.19 (environmental) or 3.21 (employee benefits) may be made at any time until the date ninety (90) days after the expiration of the applicable statute or period of limitations (including any extension of such statute or period of limitations), and (c) any claim relating to Section 3.1 (organization), 3.3 (authority), 3.4 (conflicts), 3.7 (undisclosed liabilities) or 3.8 (title to assets), fraud, or any covenant or agreement to be performed or complied with at or after the Closing may be made at any time without any time limitation.  If the Closing occurs, Buyer has no Liability with respect to any claim for any breach or inaccuracy of any representation or warranty in this Agreement or any other certificate or document delivered pursuant to this Agreement, or any covenant or agreement in this Agreement to be performed and complied with prior to the Closing Date, unless Seller notifies Buyer of such a claim on or before the date two years after the Closing Date; except that any claim relating to fraud or any covenant or agreement to be performed or complied with at or after the Closing may be made at any time without any time limitation.  If Buyer or Seller, as applicable, provides proper notice of a claim within the applicable time period set forth above, Liability for such claim will continue until such claim is resolved.

Exhibit 1.50

**8.4** **Limitations on Indemnification by Seller Parties**. Neither Seller Party has any Liability with respect to the matters described in Section 8.1 nor Buyer has any Liability with respect to matters described in Section 8.2 until the total of all Losses with respect to matters described in Section 8.1 or 8.2, as the case may be, exceeds $5,000 (the "**Basket**"), at which point each of the Seller Parties will be jointly and severally Liable to, and shall pay and indemnify Buyer for, and Buyer will be liable to, and shall pay and indemnify Seller (in each case, the Buyer or Seller entitled to payment or indemnification the ("**Indemnified Party**") for, all Losses borne by or to which the Indemnified Party otherwise is entitled, notwithstanding the previous sentence, any claim relating to Section 3.1 (organization), 3.3 (authority), 3.4 (conflicts), 3.7 (undisclosed liabilities), 3.8 (title to assets), 3.10 (work-in-progress), 3.11 (inventory stock), 3.15 (taxes), 3.18 (product and service warranties), 3.19 (environmental), 3.21 (employee benefits), or 3.27 (brokers) will not be subject to or counted towards the Basket. Except as otherwise provided in the next sentence, the Seller Parties' maximum aggregate Liability with respect to the matters described in Section 8.1 is limited to an amount equal to fifty percent (50%) of the Purchase Price (the "**Cap**"). This Section 8.4 does not apply to any fraudulent or intentional breach or misstatement of any representation or warranty or any breach of any covenant or agreement (including any described in clause (b) of Section 8.1) to be performed or complied with by a Seller Party at or after the Closing or to any claim relating to Section 3.3 (authority), 3.4 (conflicts), 3.8 (title to assets), 3.15 (taxes), 3.19 (environmental), or 3.27 (brokers).

**8.5** **Claims Not Involving Third Parties**. Any claim for payment or indemnification under this Article 8 other than a Third-Party Claim governed by 8.6 (a "**Claim**") must be asserted by the claimant (the "**Claimant**") providing written notice to Seller (if the Claim is made against either of the Seller Parties) or Buyer (if the claim is made against Buyer) specifying the factual basis of the claim in reasonable detail to the extent known by the Claimant (a "**Claim Notice**" and the Seller Party or Buyer against whom the Claim is made, the "Respondent"). Upon receipt of a Claim Notice, the Respondent has thirty (30) days to object to the Claim made in the Claim Notice by delivering a written objection (an "**Objection**") to the Claimant specifying in reasonable detail the basis of the Objection. The failure of Respondent to timely deliver an Objection to a Claim will constitute a final and binding acceptance of the Claim by the Respondent. If the Respondent timely delivers an Objection, the Parties shall in good faith seek to resolve the dispute within the 30-day period following the Objection (the "**Dispute Resolution Period**"). If the Parties have not resolved their dispute within the Dispute Resolution Period, any Party may then submit the dispute to arbitration in accordance with Section 9.15 and other applicable terms in this Agreement. Upon resolution of the dispute and determination of liability by one of the Parties (the "**Obligor**") to the other Party or Parties (the "**Obligee**"), the Obligor shall pay and otherwise discharge the liability in immediately available funds as reasonably directed by the Obligee or Arbitrator or court, as applicable within three (3) Business Days of the resolution or as provided in 8.6.

**8.6** **Third-Party Claims.**

(a) If a third party commences a lawsuit or arbitration (or threatens a Proceeding) (a "**Third-Party Claim**") against any Person (the "**Indemnified Party**") with respect to any matter that the Indemnified Party might make a claim for indemnification against any Party (the "**Indemnifying Party**") under this Article 8, then

Exhibit 1.51

the Indemnified Party must notify the Indemnifying Party thereof in writing of the existence of such Third-Party Claim and must deliver copies of any documents served on the Indemnified Party with respect to the Third-Party Claim; except that any failure to notify the Indemnifying Party or deliver copies will not relieve the Indemnifying Party from any obligation hereunder unless (and then only to the extent) the Indemnifying Party is materially prejudiced by such failure.

(b)    Upon receipt of the notice described in Section 8.6(a), the Indemnifying Party will have the right to defend the Indemnified Party against the Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party so long as (i) within ten days after receipt of such notice, the Indemnifying Party notifies the Indemnified Party in writing that the Indemnifying Party will, subject to the limitations of Section 8.4, indemnify the Indemnified Party from and against any Losses the Indemnified Party may incur relating to or arising out of the Third-Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third-Party Claim and fulfill its indemnification obligations hereunder, (iii) the Indemnifying Party is not a party to the Proceeding or the Indemnified Party has determined in good faith that there would be no conflict of interest or other inappropriate matter associated with joint representation, (iv) the Third-Party Claim does not involve, and is not likely to involve, any claim by any Governmental Authority, (v) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief, (vi) settlement of, or an adverse judgment with respect to, the Third-Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests of the Indemnified Party, (vii) the Indemnifying Party conducts the defense of the Third-Party Claim actively and diligently and (viii) the Indemnifying Party keeps the Indemnified Party apprised of all developments, including settlement offers, with respect to the Third-Party Claim and permits the Indemnified Party to participate in the defense of  the Third-Party Claim.

(c)    So long as the Indemnifying Party is conducting the defense of the Third-Party Claim in accordance with Section 8.6(b), (i) the Indemnifying Party will not be responsible for any attorneys' fees incurred by the Indemnified Party regarding the Third-Party Claim (other than attorneys' fees incurred prior to the Indemnifying Party's assumption of the defense pursuant to Section 8.6(b)) and (ii) neither the Indemnified Party nor the Indemnifying Party may consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the other party, which consent may not be withheld unreasonably.  If the Indemnified Party desires to consent to the entry of judgment with respect to or to settle a Third-Party Claim but the Indemnifying Party refuses, then the Indemnifying Party will be responsible and otherwise Liable for all Losses with respect to such Third-Party Claim, without giving effect to the Basket or the Cap.

Exhibit 1.52

(d)     If any condition in Section 8.6(b) is or becomes unsatisfied, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third-Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith), (ii) the Indemnifying Party shall reimburse the Indemnified Party promptly and periodically (but no less often than monthly) for the costs of defending against the Third-Party Claim, including attorneys' fees and expenses, and (iii) the Indemnifying Party will remain responsible and otherwise Liable for any Losses the Indemnified Party may incur relating to or arising out of the Third-Party Claim to the fullest extent provided in this Article 8.

**8.7     Manner of Payment**.  Buyer may, but is not required to, set off any amount to which it may be entitled under this Article 8 against any amount otherwise payable by Buyer or its Affiliates to Seller or Wolf or any of their Affiliates.  The exercise of such set-off right in good faith will not constitute a breach or event of default under any Contract (including this Agreement) relating to any amount against which the set-off is applied.  If Buyer does not exercise this right of set-off (or to the extent such exercise is not sufficient to fully satisfy the Liabilities of the Seller Parties under this Article 8), Buyer will seek payment of such amount directly from either Seller Party.

**8.8     Other Indemnification Matters**.  The Parties shall treat all payments under this Article 8 as adjustments to the Purchase Price.  The right to indemnification will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the Closing Date with respect to any representation, warranty, covenant or agreement in this Agreement.  **EACH PARTY (OR OTHER BENEFICIARY HEREUNDER) MAY ENFORCE THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE 8 REGARDLESS OF WHETHER (1) ANY PERSON ALLEGES OR PROVES THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE PARTY SEEKING INDEMNIFICATION, ITS AFFILIATES, OR ANY OTHER PERSON OR THE SOLE OR CONCURRENT STRICT LIABILITY IS, IN FACT, IMPOSED ON THE PARTY (OR OTHER BENEFICIARY) SEEKING INDEMNIFICATION, ITS AFFILIATES, OR ANY OTHER PERSON OR (2) OKLAHOMA GENERAL CORPORATION ACT §§ 18-1100.1 and 18-1100.2, OR ANY COMPARABLE PROVISION THAT OTHERWISE WOULD LIMIT THE TIME PERIOD WITHIN WHICH CLAIMS MAY BE BROUGHT UNDER THIS AGREEMENT AGAINST THE SHAREHOLDERS OR OTHER EQUITY OR BENEFICIAL OWNERS OF A DISSOLVED ENTITY UNDER FEDERAL, STATE OR LOCAL LAW.**  The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or agreement, will not affect the right to indemnification, payment of damages, or other remedy based on any such representation, warranty, covenant or agreement.  If, and at the time any Party dissolves and completely or partially liquidates, then such Party shall cause its shareholders, members, partners or other equity holders or beneficial owners who receive any distributions of its assets to receive and otherwise take such assets subject to the distributing Party's Liabilities under this Agreement (and each such recipient shall be jointly and severally Liable for such Liabilities to the extent of such distributions received by it); except the failure of a Party and the recipients of such

Exhibit 1.53

distributions to take such action will not in any way reduce the Liabilities of that Party and its successors and assigns under this Agreement.

**ARTICLE 9**
**MISCELLANEOUS**

9.1     **Further Assurances**.  Each Party agrees to furnish upon request to any other Party such further information, to execute and deliver to any other Party such other documents, and to do such other acts and things (including the execution and delivery of such further instruments or documents as may be necessary or convenient to transfer and convey any Purchased Asset to Buyer), all as any other Party may reasonably request for the purpose of carrying out the intent of the Transaction Documents including as needed to satisfy or comply with the Party's representations, warranties, and covenants thereunder.

9.2     **No Third-Party Beneficiaries**.  This Agreement does not confer any rights or remedies upon any Person (including any employee of Seller) other than the Parties, their respective successors and permitted assigns and, as expressly set forth in this Agreement, any Indemnified Party.

9.3     **Entire Agreement**.  This Agreement and the other Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter of the Transaction Documents and supersede all prior agreements (whether written or oral and whether express or implied) among any Parties to the extent related to the subject matter of the Transaction Documents (including any letter of intent, term sheet or confidentiality agreement).

9.4     **Successors and Assigns**.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns.  No Seller Party may assign, delegate and novate or otherwise transfer (whether by operation of law or otherwise) any of its rights, interests or obligations in this Agreement without the prior written approval of Buyer.  Buyer may assign any or all of its rights or interests, or delegate and novate any or all of its obligations, in this Agreement to (a) any successor to Buyer or any acquirer of a material portion of the business or assets of Buyer, (b) one or more of Buyer's Affiliates, or (c) any lender to Buyer or its Affiliates as security for obligations to such lender.

9.5     **Counterparts**.  This Agreement may be executed by the Parties in multiple counterparts and shall be effective as of the date set forth above when each Party shall have executed and delivered a counterpart hereof, whether or not the same counterpart is executed and delivered by each Party.  When so executed and delivered, each such counterpart shall be deemed an original and all such counterparts shall be deemed one and the same document.  Transmission of images of signed signature pages by facsimile, e-mail or other electronic means shall have the same effect as the delivery of manually signed documents in person.

9.6     **Notices**.  Any notice pursuant to this Agreement must be in writing and will be deemed effectively given to another Party on the earliest of the date (a) three Business Days after such notice is sent by registered U.S. mail, return receipt requested, (b) one Business Day after receipt of confirmation if such notice is sent by facsimile or electronic transmission, (c) one Business Day after delivery of such notice into the custody and control of an overnight courier

49

Exhibit 1.54

service for next Business Day delivery, (d) one Business Day after delivery of such notice in person, and (e) such notice is received by that Party; in each case to the appropriate address below (or to such other address as a Party may designate by notice to the other Parties):

If to Seller:

Aceco Valve, Inc./The Wolf Group, Inc.
1621 S. Eudayptus Ave, Suite 215
Broken Arrow, OK 74012
Fax: _____
Phone: _____
Attn:  Patricia A. Wolf
Email: patsy.wolf@acecovalves.com

If to Wolf:

Patricia A. Wolf
PO Box 345
Mounds, OK 74047
Fax: _____
Phone: _____
Email:  patsy.wolf@acecovalves.com


If to Buyer:

MNergy, LLC
10600 S Pennsylvania, Ste 16 PMB 526
Oklahoma City, OK 73170
Fax:  (___) _____
Phone: (918) 409- 2961
            (405) 819-7889
Attn:  Bill Neimann or Aamir Mahmood
Email:  aamirjm@gmail.com
            bill.neimann@cox.net

**9.7    JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL**. SUBJECT TO 9.6; EACH PARTY (a) CONSENTS TO THE PERSONAL JURISDICTION AND THE VENUE OF ANY STATE OR FEDERAL COURT LOCATED IN OKLAHOMA CITY, OKLAHOMA (AND ANY CORRESPONDING APPELLATE COURT) IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS; (b) AGREES THAT (UNLESS REQUIRED BY OKLAHOMA  LAW TO BE HEARD BY ANOTHER OKLAHOMA COURT WITH JURISDICTION IN OKLAHOMA CITY, OKLAHOMA) ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING TORT CLAIMS, MAY BE BROUGHT ONLY IN THE FEDERAL OR STATE COURT FOR OKLAHOMA COUNTY,

Exhibit 1.55

OKLAHOMA; AND (c) EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT THOSE COURTS ARE AN INCONVENIENT FORUM TO THE MAXIMUM EXTENT DETERMINED BY APPLICABLE LAW, AND EACH PARTY (SUBJECT TO SECTION 9.15 HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND THE VENUE OF THOSE COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT THOSE COURTS ARE AN INCONVENIENT FORUM TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.  EACH PARTY HEREBY IRREVOCABLY CONSENTS TO (A) BEING SERVED ANYWHERE IN THE WORLD BY ANY OTHER PARTY IN ANY PROCEEDING BROUGHT UNDER THIS SECTION 9.7 BY THE DELIVERY OF A COPY THEREOF IN A MANNER PERMITTED FOR PROVING NOTICE UNDER SECTION 9.6; (B) WAIVES ANY VENUE OR INCONVENIENT FORUM DEFENSE TO ANY PROCEEDING MAINTAINED IN SUCH COURTS; AND (C) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, AGREES NOT TO INITIATE ANY PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENT IN ANY OTHER COURT OR FORUM EXCEPT AS MAY BE NECESSARY TO ENFORCE AND OTHERWISE RECOVER UNDER AN ORDER ISSUED BY A COURT TO WHICH THE PARTIES HAVE CONSENTED TO PERSONAL JURISDICTION UNDER THE FIRST TWO SENTENCES OF THIS SECTION 9.7. SELLER IRREVOCABLY APPOINTS PATRICIA WOLF AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS THAT MIGHT BE SERVED IN ANY SUCH PROCEEDING. BUYER IRREVOCABLY APPOINTS Bill Neimann or Aamir Mahmood AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS THAT MIGHT BE SERVED IN ANY SUCH PROCEEDING.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR OTHERWISE CONCERNING THE COMPANY AND ANY MATTER ARISING HEREUNDER OR RELATED HERETO.  THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF SECTION 9.6 AND THIS SECTION 9.7 IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.

**9.8    Governing Law**.  This Agreement and all other Transaction Documents (unless otherwise stated therein) is governed by the laws of the State of Oklahoma without giving effect to any choice or conflict of law principles of any jurisdiction.

**9.9    Amendments and Waivers**.  To be valid, an amendment of any provision of this Agreement must be in writing and signed by the Parties.  No waiver of any provision of this Agreement will be valid unless the waiver is in writing and signed by the waiving Party.  The failure of a Party at any time to require performance of any provision of this Agreement will not affect such Party's rights at a later time to enforce such provision.  No waiver by any Party of any breach of this Agreement will be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other breach.

Exhibit 1.56

**9.10    Severability**.  Any provision of this Agreement that is determined by arbitration under Section 9.16 (or, subject to Section 9.16) any court of competent jurisdiction to be invalid or unenforceable will not affect the validity or enforceability of any other provision hereof or the invalid or unenforceable provision in any other situation or in any other jurisdiction. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**9.11    Expenses**.  Except as otherwise expressly provided in this Agreement, Seller will bear and pay all expenses incurred by the Seller Parties or any of their respective Representatives in connection with the Transactions contemplated to be performed before or on the Closing Date. Buyer will bear and pay all expenses incurred by Buyer or any of its Representatives in connection with the Transactions contemplated to be performed before or on the Closing Date. If this Agreement is terminated, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by another Party.

**9.12    Interpretation**.  The article and section headings in this Agreement are inserted for convenience only and are not intended to affect the interpretation of this Agreement.  Any reference in this Agreement to any Article or Section refers to the corresponding Article or Section of this Agreement.  Any reference in this Agreement to any Schedule or Exhibit refers to the corresponding Schedule or Exhibit attached to this Agreement and all such Schedules and Exhibits are incorporated herein by reference.  The word "including" (or any variation thereof) in this Agreement means "including without limitation."  This Agreement is to be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision in this Agreement.  Unless the context requires otherwise, any reference to any Law is to be deemed also to refer to all amendments and successor provisions thereto and all rules and regulations promulgated thereunder, in each case as in effect as of the Closing Date.  All accounting terms not specifically defined in this Agreement are to be construed in accordance with GAAP as in effect on the Closing Date (unless another effective date is specified herein).  The word "or" in this Agreement is disjunctive but not necessarily exclusive.  All words in this Agreement are to be construed to be of such gender or number as the circumstances require.  References in this Agreement to time periods in terms of a certain number of days mean calendar days unless expressly stated herein to be Business Days.  In interpreting and enforcing this Agreement, each representation and warranty is to be given independent significance of fact and is not to be deemed superseded or modified by any other such representation or warranty.

**9.13    Specific Performance**.  Each Party acknowledges that the other Parties would be damaged irreparably and would have no adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached. Accordingly, each Party agrees that the other Parties are entitled to obtain an injunction to prevent any breach of any provision of this Agreement and to enforce specifically any provision of this Agreement, which right is in addition to any other remedy to which they may be entitled and without having to prove the inadequacy of any other remedy they may have at law or in equity and without being required to post bond or other security

**9.14    Time Is of the Essence**.  Time is of the essence with respect to all time periods and dates set forth herein.

Exhibit 1.57

**9.15    Intentionally Omitted.**

**9.16    Dispute Costs**.  In any legal or arbitration Proceedings, or other actions between any of the Parties hereto to enforce any of the terms or conditions of this Agreement or any other Transaction Document, or any other action that in any other way pertains to any Transaction or this Agreement, the prevailing Party, in addition to any other damages or compensation received, will be entitled to recover that Party's litigation or arbitration costs, including reasonable attorneys' fees, expenses, and costs of any appeals.

**9.17    Seller's Representative.**

(a)    <u>Appointment and Power and Authority of Seller's Representative</u>.  Seller, on behalf of Seller and Seller's successors (individually or collectively) and permitted assigns, hereby appoints Wolf as "**Seller's Representative**" to serve as Seller's agent and attorney-in-fact, with full power of substitution, for all purposes set forth in this Agreement, including the full power and authority to (i) perform the Transactions to be performed by Seller (individually and collectively) under this Agreement, (ii) receive any funds to be paid hereunder to Seller, (iii) execute and deliver on behalf of Seller any amendment or waiver under this Agreement and to agree to resolution of all claims hereunder, (iv) retain legal counsel and other professional services, at the expense of Seller, in connection with the performance by Seller's Representative of this Agreement; and (v) do each and every act and exercise all rights which Seller is permitted or required to do or exercise under this Agreement.  If Seller's Representative resigns or is otherwise unable or unwilling to serve in such capacity, Seller shall appoint a new Person to serve as Seller's Representative (Seller will be bound by that appointment) and will provide prompt written notice thereof to Buyer.  Until such notice is received, Buyer may rely on the actions and statements of the previous Seller's Representative.  The power and authority granted hereunder will be exclusive and Seller may not exercise any right under this Agreement, except through Seller's Representative.

(b)    <u>Special Power-of-Attorney Coupled with an Interest</u>.  The appointment of Seller's Representative as the attorney-in-fact for Seller as set forth in this Section 9.17 and all authority hereby conferred are granted and conferred by Seller to Seller's Representative under this Section 9.17, is a special power-of-attorney coupled with an interest and is and will be irrevocable and shall neither be terminated nor otherwise affected by any act of Seller or by operation of law, whether by the dissolution, liquidation, bankruptcy, insolvency, or termination of Seller or by the occurrence of any other event and shall extend to Seller's successors and assigns (if any).  If, after the execution of this Agreement, Seller dissolves or otherwise becomes unable to act, Seller's Representative is nevertheless authorized, empowered, and directed to act in accordance with this Section 9.17 as if that dissolution, liquidation, termination, or inability had not occurred and regardless of notice thereof.  Seller agrees to execute such documents as may be necessary and to give such instructions to its legal representatives as may be necessary so that its successors will remain subject to this Agreement and carry out the full intent and purposes hereof.

{Rest of page intentionally left blank}

Exhibit 1.58

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the Closing Date.

**"BUYER"**

MNERGY, LLC


By:_____
            Billy D. Neimann, President


**"SELLER"**

ACECO VALVE, INC.


By:_____
Name: Patricia A. Wolf, President


**"WOLF"**

Patricia A. Wolf


_____

Patricia A. Wolf, an individual

Exhibit 1.59

EXHIBIT "A"

(Attach a copy of the Real Estate Purchase and Sale Agreement)

55

Exhibit 1.60

EXHIBIT "B'

(Attach the Closing Documents Checklist.)

Exhibit 1.61